# ALBANY AND RENSSELAER COMPANY *v.* LUND-BERG.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Argued April 1, 1887. — Decided April 25, 1887.

A written contract, made in this country, by which "I, Gustaf Lundberg, agent for N. M. Höglund's Sons & Co. of Stockholm, agree to sell, and we, Albany and Rensselaer Iron and Steel Co., Troy, N. Y., agree to buy" certain Swedish pig iron, which contains no other mention of the Swedish firm, and is signed by Lundberg with his own name merely, as well as by the purchaser, will sustain an action by Lundberg in a court of the United States within the state of New York, by virtue of § 449 of the New York Code of Civil Procedure and § 914 of the Revised Statutes of the United States, if not at common law.

Upon the question whether a warranty, in a written contract of sale of Swedish pig iron, of a particular brand, that the iron shall contain no more than a specified proportion of phosphorus, has been complied with, evidence of the proportion of phosphorus in pig iron made in previous years at the same furnace out of ore from the same mine is irrelevant and incompetent.

THIS was an action at law on a contract. Verdict for the plaintiff, and judgment on the verdict. The defendant sued out this writ of error. The case is stated in the opinion of the court.

*Mr. Edwin Countryman* for plaintiff in error.

*Mr. Everett P. Wheeler* for defendant in error.

MR. JUSTICE GRAY delivered the opinion of the court.

This action was brought by Gustaf Lundberg, an alien and a subject of the Kingdom of Sweden and Norway, residing at Boston in the State of Massachusetts, against the Albany and Rensselaer Iron and Steel Company, a corporation of the State of New York, upon two contracts for the sale and purchase of Swedish pig iron, the first of which was as follows:

"N. M. Höglund's Sons & Co., Stockholm.;

"Gustaf Lundberg, Successor to Nils Mitander:

"38 Kilby Street, Boston, February 10, 1880.

"I, Gustaf Lundberg, agent for N. M. Höglund's Sons & Co. of Stockholm, agree to sell, and we, Albany and Rensselaer Iron and Steel Co., Troy, N. Y., agree to buy the following Swedish charcoal grey pig iron, viz: 500 tons of brand NBGPH, at a price of forty-eight ($48) dollars, American gold, per ton of 2240 lbs., delivered on wharf at New York, duty paid; said iron to be in accordance with an analysis furnished in Gustaf Lundberg's letter of 6th February. Payment in gold in Boston or New York funds within 30 days from date of ship's entry at custom-house. Shipment from Sweden during the season, say May next, or sooner, if possible. The above quantity hereby contracted for to be subject to such reduction as may be necessitated by natural obstacles and unavoidable accidents. The seller not accountable for accidents or delays at sea. Signed in duplicate.

"Accepted, Gustaf Lundberg.

"Accepted, Albany & Rensselaer Iron & Steel Co."

The other contract differed only in being for the sale and purchase of "300 tons of brands SBVE and NBBBK."

The analysis referred to in both contracts showed, in the first brand .03, and in the two other brands .024, of one per cent of phosphorus.

The above amount of iron was made in Sweden, that of the first brand at the Pershytte furnace of the Ramshyttan Iron Works, out of ore from the Pershytte mines, and that of the two other brands at the Svana Iron Works; was bought and shipped from Stockholm by N. M. Höglund's Sons & Co. in May, 1880; arrived at New York, in June, 1880, and was thence taken to the defendant's works at Troy. An analysis there made by the defendant's chemist showed in the three brands respectively .047, .042 and .049, of one per cent of phosphorus. The defendant therefore refused to take the iron, and returned it to the plaintiff, who afterwards sold it for less than the contract price, brought this action to recover

the difference, and obtained a verdict and judgment for upwards of $15,000. The defendant sued out this writ of error.

The first question presented by the bill of exceptions is, whether this action can be maintained in the name of Lundberg, or should have been brought in the name of his principals, N. M. Höglund's Sons & Co.

The paper upon which each of the contracts in suit is written has at its head, besides the name of that firm, the name of "Gustaf Lundberg, successor to Nils Mitander," followed by the street and number of his office in Boston. The contract itself begins with a promise by him in the first person singular, "I, Gustaf Lundberg, agent for N. M. Höglund's Sons & Co. of Stockholm, agree to sell;" the description added to his name in this clause is the only mention of or reference to that firm in the contract; his promise is not expressed to be made by them as their agent, or in their behalf; and the agreement is signed by him with his own name merely.

There are strong authorities for holding that a contract in such form as this is the personal contract of the agent, upon which he may sue, as well as be sued, in his own name, at common law. *Kennedy* v. *Gouveia*, 3 D. & R. 503; *Parker* v. *Winlow*, 7 E. & B. 942; *Dutton* v. *Marsh*, L. R. 6 Q. B. 361; *Buffum* v. *Chadwick*, 8 Mass. 103; *Packard* v. *Nye*, 2 Met. 47. In *Gadd* v. *Houghton*, 1 Ex. D. 357, the contract which was held not to bind the agent personally was expressed to be made "on account of the principals;" and in *Oelricks* v. *Ford*, 23 How. 49, in which the contract, which was held to bind the principal, more nearly resembled that before us than in any other case in this court, the important element of a signature of the agent's name, without addition, was wanting.

But it is unnecessary to express a definitive opinion upon the question in whose name, independently of any statute regulating the subject, this action should have been brought.

The Code of Civil Procedure of the State of New York contains the following provision:

"Sec. 449. Every action must be prosecuted in the name of the real party in interest, except that an executor or administrator, a trustee of an express trust, or a person expressly

authorized by statute, may sue without joining with him the person for whose benefit the action is prosecuted. A person with whom, or in whose name, a contract is made for the benefit of another, is a trustee of an express trust, within the meaning of this section."

Under this provision, the Court of Appeals of that state has held that an agent of a corporation, to whom, "as executive agent of the company," a promise is made to pay money, is "a person with whom, or in whose name, a contract is made for the benefit of another," and may therefore sue in his own name on the promise. *Considerant* v. *Brisbane*, 22 N. Y. 389. The rule thus established is applicable to actions at law in the courts of the United States held within the State of New York. Rev. Stat. § 914; *Sawin* v. *Kenny*, 93 U. S. 289; *Weed Sewing Machine Co.* v. *Wicks*, 3 Dillon, 261; *United States* v. *Tracy*, 8 Benedict, 1.

The case then stands thus: If the agreement to sell is an agreement made by Lundberg personally, and not in his capacity of agent of the Swedish firm, the price is likewise payable to him personally, and the action on the contract must be brought in his name, even at common law. If, on the other hand, the agreement must be considered as made by Lundberg, not in his individual capacity, but only as agent and in behalf of the Swedish firm, and for their benefit, then the price is payable to him as their agent, and for their benefit, in the same sense in which an express promise to pay money to him as the agent of that firm would be a promise to pay him for their benefit, and therefore, by the law of New York, which governs this case, an action may be brought in his name. In either view, this action is rightly brought.

The clause, in each of the contracts sued on, "said iron to be in accordance with an analysis furnished in Gustaf Lundberg's letter of 6th February," is doubtless a warranty that the iron shall not contain a greater proportion of phosphorus than is specified in that analysis. The question of fact most contested at the trial was whether the iron tendered by the plaintiff to the defendant fulfilled this warranty.

There was evidence tending to show that any excess of

phosphorus in pig iron would affect the quality of wrought iron or steel made from it, rendering it more brittle, and could be detected by bending the rods after they had been made; and the court, at the request of the defendant, and with the consent of the plaintiff, instructed the jury as follows: "If the jury find that either lot of iron differed as much as one one-hundredth of one per cent in excess of the limit of phosphorus stated in the analysis referred to in the contract, that constituted a breach of the warranty and entitled the defendant to refuse to receive the iron."

Each party called as witnesses many experts, who had made analyses of the iron in question since its arrival, some of whom testified that the amount of phosphorus in each brand was no greater than in the analysis referred to, and others testified that it was more than two hundredths of one per cent greater, or nearly twice as much.

The plaintiff also introduced several depositions taken in Sweden, so much of which as is material to be stated was as follows:

O. Anderson, the manager and a part-owner of the Ramshyttan Iron Works for the last seventeen years, testified that his experience was in the practical part only of the iron manufacture; that he knew the quality, and the percentage of phosphorus, of the iron sold to N. M. Höglund's Sons & Co. in 1880, only from an analysis made by Bernhard Fernguist of pig iron from the same furnace in 1878; that no special analysis was made of the iron sold to the Höglunds, and "no new analysis was made, because no change in the ore was observed;" that other iron was made in the same furnace in 1880, "but all of exactly the same quality;" and further testified: "In the process of manufacture no special tests were made on this pig iron, but I know that this iron is used in the manufacture of Siemens & Martin's steel and iron, and there found to be good."

Fernguist, a professor of chemistry at Orebro, who had made analyses of irons and ores for twenty years, testified to the analysis made by him of pig iron from the Pershytte furnace in 1878, which showed it to contain .028 of one per cent of phosphorus.

Harold Dillner, "an officer in the metallurgic department in the Board of Iron Masters," who in 1880 and for some years before had assisted the owners and manager of the Ramshyttan Iron Works "as technical assistant at Pershytte furnace," being asked his means of knowledge in regard to the percentage of phosphorus in the parcels of iron sold to the Höglunds, and whether he knew of these parcels, or any of them, having been put to any practical test, testified : "We have trustworthy analyses of the ores from Pershytte mines and of pig iron from Pershytte furnace, which verify the always excellent quality of the ore and the pig iron manufactured of it." "It is generally known that the iron is of excellent quality, and I made no special tests."

A. E. Cassel, manager of the Svana Iron Works in 1879 and 1880, having testified, as to the iron from those works sold to the Höglunds in 1880, that the inspection of its manufacture at the furnaces was conducted "in the same manner as during the preceding years, with the greatest care and attention," and that his means of knowledge as to the percentage of phosphorus in this iron were derived from previous analysis of iron that they manufactured, further testified : "In the pig iron we made, the percentage of phosphorus is about .022 per cent, and of sulphur, 0.22 ; and I think that the pig iron in question contained about these quantities." "Complete journal is kept of how much of each kind of ore is used for each day. The quality of the ores has not changed materially during the last five years."

The admission of this testimony in the depositions was duly excepted to, and we are of opinion that it was incompetent. Much of it, and especially Anderson's remark that this iron was found to be good in the manufacture of steel and iron by Siemens & Martin, was mere hearsay. All the statements of the deponents as to the proportion of phosphorus in the iron in question were based on analyses by other persons of pig iron made in previous years, none of which were produced, or their contents proved, with the single exception of Fernguist's analysis of iron from the Pershytte furnace two years before. It is not shown, and cannot be presumed, that

a difference of one or two hundredths of one per cent in the amount of phosphorus in pig iron could be detected by observation of the ore, or by inspection of the manufacture of the pig iron.   Under these circumstances, evidence of the amount of phosphorus in iron made in previous years was wholly irrelevant to the question of the amount of phosphorus in iron made in 1880; and the general expressions of opinion as to the excellence of the pig iron and the care taken in its manufacture did not render that evidence competent, but rather tended to divert the attention of the jury from the real issue, which was whether the particular iron tendered by the plaintiff to the defendant conformed to the express warranty in the contract between them.

The case differs from that of *Ames* v. *Quimby,* 106 U. S. 342, where, in an action to recover the price of shovel-handles sold to the defendant, evidence of the good quality of other like handles sold by the plaintiff at the same time was admitted, accompanied by direct evidence that the latter were of the same kind and quality as the former.

This testimony being irrelevant and incompetent, and manifestly tending to prejudice the defendants with the jury, its admission requires the verdict to be set aside; and it becomes unnecessary to consider the rulings upon other evidence and upon the question of damages.

*Judgment reversed, and case remanded to the Circuit Court, with directions to set aside the verdict and to order a new trial.*