**BACHE & CO., Incorporated, Plaintiff,**

**v.**

**INTERNATIONAL CONTROLS CORP., Defendant.**

**No. 68 Civ. 4133.**

United States District Court,
S. D. New York.
March 29, 1971.

Sullivan & Cromwell, New York City, for plaintiff; Howard T. Milman, Joel M. Miller, New York City, of counsel.

Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, Hogan & Hartson, Washington, D. C., for defendant; David R. Hyde, Allen S. Joslyn, New York City, David A. Ludtke, James A. Hourihan, Washington, D. C., of counsel.

OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW

LEVET, District Judge.

This action arises from a tender offer which defendant International Controls Corp. ("ICC") made in the fall of 1968 for the securities (common stock and de-bentures convertible into common stock) of Electronic Specialties Co. ("ELS"). Plaintiff Bache & Co. Incorporated ("Bache") claims that it properly tendered ELS securities in response to that offer; ICC denies that Bache made proper tender.

The case was tried to the court without a jury on the issue of liability only.

After hearing the testimony of the parties, examining the exhibits, the pleadings and the proposed findings of fact and conclusions of law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Plaintiff is a corporation organized and existing under the laws of the State of Delaware, engaged in a general securities business, a member of the New York Stock Exchange and other national securities exchanges, and has its principal office at 100 Gold Street, New York, New York (Complaint par. 1; Answer par. 1).

2. Defendant is a corporation of the State of Florida having its principal place of business at 88 Clinton Road, Fairfield, New Jersey (Complaint par. 2; Answer par. 2).

3. The action was commenced by attachment in the Supreme Court of the State of New York, County of New York, and was removed to this court pursuant to 28 USC § 1441. There is diversity of citizenship and the amount in controversy exceeds $10,000 (Pretrial Order [1] par. 3(a) (i).

4. On August 19, 1968, ICC published a tender offer seeking to purchase such number of the outstanding securities, common stock and convertible debentures of ELS as would result in its acquiring 500,000 shares (assuming conversion of the debentures) of the common stock at a price of $39.00 per share for common stock and $1,236 per $1,000 debenture, net to the seller in cash, plus a commission of 70¢ per share of common stock

and $22.19 per $1,000 debenture to soliciting securities dealers (PX 1).[2] The tender offer was captioned "Offer to Purchase."

5. On September 9, 1968, defendant published a press release carried on the Dow Jones Broad Tape and The Wall Street Journal which read:

"International Controls Corp. announced today that its tender offer for common stock and 5% convertible debentures of Electronic Specialty Co. has already resulted in the tender of more than the 500,000 shares for which it tendered. International Controls Corp. has amended its tender offer to now accept all Electronic Specialty Co. Common Stock and convertible debentures tendered without limit and has extended the time in which to tender until 5:00 P.M., Pacific Coast time, Thursday, September 12, 1968. The price to be paid in cash is $39.00 per share of common stock and $1,-236.00 per convertible debenture, all net to the Seller.

"Securities dealers will receive $.70 per share of common stock and $22.19 per $1,000.00 debenture solicited by them and accepted by International Controls Corp." (PTO par. 3(a) (v))

6. The tender offer was twice extended and expired at 5:00 P.M., Pacific Coast Time, September 12, 1968 (PTO par. 3(a) (iii))

7. Between August 30, 1968 and September 12, 1968, Bache tendered to ICC's forwarding agent for itself 9,348 shares of common stock and on behalf of approximately 145 of its customers 21,301 shares of common stock (a total of 30,-649 shares of common stock) and at least 42 $1,000 debentures of ELS (Tr. 103–106; PX 9, PX 11, PX 7A–E; PTO par. 3(a) (iv)). Those tenders were made in Bache's name (PX 9, PX 11) by means of a letter of transmittal form (PX 2) supplied by ICC, without delivery of certificates. This printed form was sub-

titled "Tender of Shares in Acceptance of Offer."

8. Bache, however, executed letters of transmittal for some 148 more shares than it had been instructed to by its customers (Tr. 146, 185–187, 189–192). Bache, immediately upon discovery of this error on the day following the close of the offer, purchased an additional 148 shares (Tr. 198).

9. The tender offer provided, in the Letter of Transmittal, that accepting stockholders and debenture holders could either deliver the securities with the transmittal letter, or they could deliver the Letter of Transmittal without the stock certificates or debentures. In the latter event, the Letter of Transmittal form (PX 2) provided in its second paragraph:

"If the certificates representing the shares and Debentures tendered hereby are not enclosed, a member of a national securities exchange or a commercial bank or trust company must guarantee in the space provided below that such certificates and Debentures will be deposited with you [Bank of America National Trust and Savings Association or The First Jersey National Bank, the depositaries, or Chemical Bank New York Trust Company, the forwarding agent] not later than 5 business days after written or oral notice from you to such member firm, bank or trust company that this tender has been accepted by the Purchaser [ICC]."

The guarantee form, appearing in the box headed "TO BE USED ONLY IF CERTIFICATES ARE NOT TRANSMITTED HEREWITH," provided:

"The undersigned, a member of a national securities exchange * * * guarantees to deliver to the Depositary certificates for the shares and the Debentures tendered by this Letter of Transmittal, duly endorsed in blank or accompanied by duly executed stock

---

2. Plaintiff Bache's exhibits will be referred to as "PX ———," defendant ICC's exhibits as "DX ———."

powers, with signatures guaranteed in accordance with the terms and conditions set forth on the reverse side hereof, not later than 5 business days after written or oral notice of acceptance thereof by the Purchaser is given by the Depositary."

Bache signed the guarantee form on each of the relevant Letters of Transmittal (PX 9, PX 11).

10. The prevailing custom and usage in the securities business industry is for each member of a national securities exchange which guarantees subsequent delivery of certificates representing securities tendered in acceptance of a tender offer to receive written or telephone notice directly from the depositary bank or forwarding agent informing that guarantor that its tender of the securities was properly made and accepted and stating the date by which certificates should be delivered (Tr. 211, 258, 302).

11. On September 12, 1968, defendant published a press release carried on the Dow Jones Broad Tape and The Wall Street Journal which read:

"International Controls Corp. announced today that its tender offer for Common Stock and 5% Convertible Debentures of Electronic Specialty Co. has resulted as of the close of business on September 10, 1968 in the tender of Common Stock and Debentures totaling over 600,000 shares (assuming conversion of the Debentures). International Controls Corp. will accept all Electronic Specialty Co. Common Stock and Convertible Debentures tendered before 5:00 P.M., Pacific Coast Time, Thursday, September 12, 1968. The price to be paid in cash is $39.00 per share of Common Stock and $1,236.00 per $1,000.00 Convertible Debenture, all net to the seller. The sources of the funds to be used by International Controls Corp. are the same as those set forth in its Offer published on August 19, 1968, notwithstanding the fact that International Controls Corp. has amended its Offer to now accept all Common Stock and Convertible Debentures tendered." (PTO par. 3(a) (vi))

12. On September 16, 1968, defendant published a press release carried on the Dow Jones Broad Tape and The Wall Street Journal which read:

"International Controls Corp. announced today that at the conclusion of its tender offer for Common Stock and Convertible Debentures of Electronic Specialty Co. on September 12, 1968, it had received tenders of 1,300,000 shares of Common Stock—(assuming conversion of the Debentures).

"Although International Controls Corp. announced that it would accept and pay for all shares properly tendered, it was taking the unusual step of permitting tendering Electronic Specialty Co. stockholders to withdraw their shares up to and including September 24, 1968. This step was being taken to assure full and fair disclosure to all tendering shareholders and notice to this effect is being mailed to them this week." (PTO par. 3(a) (viii))

Five business days after September 16th was September 23rd.

13. Defendant issued a Withdrawal Offer, dated September 16, 1968, by which defendant offered to persons who had tendered their shares the opportunity to withdraw such shares (PX 12). A copy of that Withdrawal Offer was mailed to Bache by the First Jersey Bank on September 16, 1968 (Tr. 214).

14. ICC instructed its depositary not to give the notice to deliver to banks and brokers required by the contracts (Tr. 205, 209–211).

15. On September 16, 1968, Bache asked Chemical Bank, ICC's agent for such purposes (PX 1, p. 4) when delivery of guaranteed securities was to be made by Bache; Bache was told by a Mr. Reinhardt of Chemical Bank that Chemical Bank would let it know, but such notice was never given to Bache (Tr. 118–119; PX 29).

16. The notice to banks and brokers from the depositary required by the con-

tracts between Bache and ICC was never given by the depositaries or the forwarding agent (Chemical Bank) or received by Bache (Tr. 110, 119, 128, 205, 209–211, 212, 238).

17. Notice was not given to Bache by Mr. Howard A. Singer, an employee of defendant (Tr. 122–123, 168–169, 354–356, 394, 409–431; PX 24).

18. By September 19, 1968, Bache had certificates in its own name, in deliverable form, representing its total tender in its New York office ready for immediate delivery upon receiving notice that ICC was ready to accept delivery of certificates (Tr. 66, 70–71; PX 20, PX 21).

19. Although it had not received notice to deliver the certificates, on October 2, 1968 Bache delivered certificates representing the tendered securities to Chemical Bank New York Trust Company, the forwarding agent named in the Letter of Transmittal (Tr. 71–73, 129–130; PX 17, PX 22, PX 23).

20. Delivery was rejected by defendant with the following explanation written by defendant's agent on the letter accompanying the delivery:

"Rejected since we do not have instructions from H. Singer of International Controls * * * to accept said shares and debentures." (PX 17)

21. ICC failed and refused to pay for the stock and debentures which it had agreed to purchase from Bache (PTO par. 3(a) (xii)).

### DISCUSSION

The crucial question here is one of notice. Bache delivered to Chemical Bank of New York letters of transmittal on forms provided by ICC for 30,649 shares of ELS common stock and 44 $1,000 ELS convertible debentures.[3]

Those transmittal forms provided, in substance, that if certificates representing the shares and debentures tendered were not enclosed with the letter of transmittal, then those certificates were to be delivered to either one of two named depositaries or to the forwarding agent not later than five business days after written or oral notice of acceptance was given by the depositary.

The named depositary never gave such notice—either oral or written—to Bache (see Findings of Fact Nos. 13, 14). Nonetheless, defendant claims that adequate notice of acceptance was given to plaintiff and that plaintiff's delivery of the certificates on October 2, 1968 came more than five business days after said notice which thereby rendered said delivery late and defective.

Defendant argues that any and all of the following constituted notice to plaintiff of acceptance:

1. A press release by defendant on September 9, 1968 carried on the Dow Jones Broad Tape and The Wall Street Journal announcing that ICC would accept all ELS shares tendered rather than only the 500,000 shares originally covered by its tender offer;

2. A press release by defendant on September 12, 1968 carried on the Dow Jones Broad Tape and The Wall Street Journal repeating the fact that the tender offer had been amended so that ICC would accept all shares tendered and further announcing that 600,000 shares had been tendered to date;

3. A press release by defendant on September 16, 1968 carried on the Dow Jones Broad Tape and The Wall Street Journal announcing that ICC was taking the unusual step of permitting tendering shareholders to withdraw their shares;

4. A "Withdrawal Offer" published by defendant on September 16, 1968 and distributed by the depositaries to shareholders who had tendered shares of ELS stock in response to the original tender offer;

5. A conversation between a Mr. Samuel Lensky, an employee of Bache, and a Mr. Howard A. Singer, ICC's gen-

---

3. Bache had instructions to tender 42 $1,000 debentures and is seeking to recover only for 42 (Tr. 163).

eral attorney and assistant secretary—a conversation which plaintiff contends never took place.

Let us first consider the three press releases. At times defendant seems to argue that all three constitute sufficient notice of acceptance and that therefore all three set in motion separate five day notice periods (a rather contradictory state of affairs which was never explained by defendant).[4] Defendant seems, however, to have decided to rely principally on the last release of September 16 since it is claimed throughout that the time for delivery expired on September 23, 1968, September 23 being five business days after September 16.

■ Defendant's arguments here simply do not pass muster. First, the letter of transmittal which prescribes the method of giving notice, and which was drafted by defendant, provides specifically that the notice was to come from one of the depositaries or from the forwarding agent directly to Bache (see PX 2). The contract language is quite clear and specific—as is the prevailing custom and usage in the securities business which contemplates the giving of actual notice exactly as that prescribed in the contract (see Finding of Fact No. 10). Defendant cannot now be heard to argue that oblique references to acceptance buried in a news article in The Wall Street Journal or the Dow Jones Broad Tape can suffice as a substitute.

Furthermore, even if the contract could be read to countenance notice by publication, the press releases would still fail as inadequate notice because of their ambiguity. No one reading those releas-es could fairly argue that they provided notice to plaintiff that its tender was accepted and that the five day period for delivery had commenced to run.

■ Defendant argues alternatively that notice was provided by the "Withdrawal Offer" published by defendant on September 16, 1968 and mailed by its depositaries the same day (see Finding of Fact No. 12). One need only read the "Withdrawal Offer" to see why this contention must fail. We must look to the 4th paragraph of the first page of the withdrawal offer[5] for that portion of the document which defendant contends provides the notice. This paragraph is certainly not a notice of acceptance to those who had guaranteed delivery. Quite the contrary, it is a notice to those persons who had delivered their shares that those shares actually delivered—as opposed to guaranteed—would be accepted and paid for on September 24, 1968 unless they were withdrawn. To argue that this constitutes notice to deliver guaranteed shares is wholly specious.

Finally we come to the phone call which defendant claims took place between Mr. Lensky and Mr. Singer. The court is faced with a clear conflict of testimony. Mr. Lensky testified (Tr. 122–123, 168–169) that he called Mr. Singer's office to ask only about extending the withdrawal offer. He further testified that he spoke only with Mrs. Howell, Mr. Singer's secretary, and not with Mr. Singer himself.

Singer claimed (Tr. 354–356) that he spoke personally with Lensky and that Lensky asked for extension of time to deliver guaranteed shares (as opposed to

---

4. Does each separate press release constitute a separate acceptance? Since the tender offer did not expire until September 12, are we then to believe that the press release of September 9 "accepted" shares not yet tendered, or does each separate press release "accept" only such shares as were tendered in the period following the previous press release?

5. That portion of the "Withdrawal Offer" upon which defendant relies is as follows: "Acceptance and purchase by International of tendered shares and deben-tures which are not withdrawn will be made at the Withdrawal Expiration Time, or at such earlier time as the stockholder or debenture holder notifies any of the addressee banks in writing that he does not intend to withdraw such shares or debentures, or takes such other action such as cashing the enclosed check, as International may fairly assume to be equivalent to such notification . . . ." (PX 12)

extension of the withdrawal offer), to which the answer was "No." This version was agreed to by Mrs. Howell in her testimony (Tr. 412–431).

This court is more persuaded by Mr. Lensky's version of what happened for several reasons: Mr. Lensky appeared the most credible on the witness stand; a telephone log kept by Mrs. Howell for Mr. Singer [6] tends to corroborate Mr. Lensky's version of what the subject of the phone call was; Mr. Singer said in his deposition that the log had appeared correct to him when he looked at it five days later (Tr. 394); there were certain inconsistencies in the testimony of Mr. Singer and Mrs. Howell—such as whose initials were on the log (Tr. 409–411, 422).

However, even if we were to find that the conversation took place as Mr. Singer claimed, such a conversation, late in the afternoon on a Friday (September 20, 1968), which demands that delivery be made the following Monday (September 23, 1968), hardly constitutes the five business days' notice required by the contract.

### RULE 10b–4 DEFENSE

As a further defense, ICC claims that Bache short-tendered by some 2,148 shares and thus violated Section 10(b) of the Securities and Exchange Act of 1934, 15 USC § 78j(b) and Rule 10b–4 thereunder, 17 C.F.R. § 240; 10b–4.

Rule 10b–4, the so-called short tendering rule, makes it a "manipulative or deceptive device or contrivance" for a person to tender any security "for his own account unless (i) he owns the security * * *."

▮▮▮ ICC claims that Bache tendered 2,148 shares for itself over the number of shares it owned at the time of the offer. The facts indicate, however, that Bache short-tendered by only 148 shares (Tr. 185–189, 198) out of a total of 30,649 shares tendered; that this error was caused by duplicate customer instructions (Tr. 198); and that, upon discovering its error on the day following the close of the offer, Bache immediately purchased an additional 148 shares (Tr. 198).

The apparent focus of Rule 10b–4 is the deceptive practice of short tendering in order to manipulate the normal pro-rata requirements of most tender offers (see VI Loss, Securities Regulations, 3662, 3663). There is no indication here of any fraudulent or manipulative intent on the part of Bache. Furthermore, the error is confined to a very small number of shares. Rule 10b–4 does not properly apply to such a situation where the error is of such minor proportions and where there is no specific intent to defraud.

### BACHE'S STANDING TO RECOVER FOR ITS CUSTOMERS

Finally, ICC claims that Bache lacks standing to recover for its customers on whose behalf it tendered. Rule 17(a) of the Federal Rules of Civil Procedure specifically provides, however, that "a party with whom or in whose name a contract has been made for the benefit of another * * * may sue in his own name without joining with him the party for whose benefit the action is brought." Cf. Edward B. Marks Music Corp. v. Jerry Vogel Music Co., 140 F.2d 268 (2nd Cir. 1944).

Defendant claims that this quoted language applies only to third party beneficiary contracts and not to the sort of agency situation which characterizes Bache's relationship with its customers. The plain wording of the Rule does not suggest such a limiting construction, but even assuming that defendant's contention has merit, nonetheless, that portion of Rule 17(a) which allows a "trustee of an express trust" to sue in his own name has been construed to allow an agent who

---

**6.** That portion of the log which refers to a phone call from "Sam Lensky, Baitch [sic] & Co." indicates the message received by Mrs. Howell was as follows: "Withdrawal on 24—Mon & Tues Jewish Holidays. Only received notice today." (PX 24)

has contracted in his own name to sue without joining his principal. Farmers Underwriters Ass'n v. Wanner, 30 F. Supp. 358 (D.Idaho 1939); Albany & Rensselaer Iron & Steel Co. v. Lundberg, 121 U.S. 451, 7 S.Ct. 958, 30 L.Ed. 982 (1887); Gray & Co. v. Cavalliotis, 276 F. 565 (E.D.N.Y.1921); Cf. 3A Moore's Federal Practice ¶ 17.12, n. 20.

█ Thus, there is adequate authority supporting Bache's claim that it is a proper party to sue on behalf of its customers. Moreover, ICC seems in no way prejudiced by Bache's representation of its customers' interests. Defendant argues at some length about res judicata requirements, but it is abundantly clear that any decision here for Bache as representative of its clients would act as a bar to further suits by those clients against ICC on the same claim.

█ As the party in whose name this contract was made, Bache is the proper party to bring this action. The law wisely does not require the inconvenience to the court and the expense to the parties of having the 145 Bache customers made actual parties to this suit.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and the subject matter under the provisions of 28 USC §§ 1332 and 1441.

2. A separate determination of damages will follow this determination as to liability, pursuant to agreement of the parties (Rule 42(b), Federal Rules of Civil Procedure; Tr. 1).

3. Bache accepted ICC's tender offer (PX 1) ("Offer to Purchase") and created binding contracts by its tender of 30,649 shares and 42 $1,000 debentures between August 30 and September 12, 1968 on letter of transmittal forms (PX 2) supplied by ICC ("Tender of Shares in Acceptance of Offer").

4. Pursuant to the terms of the contract, Bache was not required to deliver certificates or debentures with the Letters of Transmittal for the securities tendered, but guaranteed to deliver the certificates and debentures not later than five business days after it received notice to do so from the depositary or forwarding agent (PX 2).

5. Bache never received notice from ICC to deliver said certificates and debentures and Bache's delivery of said certificates and debentures to Chemical Bank on October 2, 1968 was therefore proper and timely performance of its obligation to deliver.

6. ICC wrongfully breached its contracts to accept and pay for the securities tendered.

7. Bache's tender of 148 shares more than the number of shares it owned at the time of the offer does not constitute a violation of Rule 10b–4 promulgated under the Securities Act of 1934, 15 USC § 78j(b), 17 C.F.R. § 240; 10b–4.

8. Bache, the real party in interest, is the proper party to bring this action on behalf of its customers from whom it tendered securities. Rule 17(a), Federal Rule of Civil Procedure; Edward B. Marks Music Corp. v. Jerry Vogel Music Co., supra; Farmers Underwriters Ass'n v. Wanner, supra; Albany & Rensselaer Iron & Steel Co. v. Lundberg, supra.

9. Bache is entitled to judgment that ICC is liable to Bache for the 30,649 shares and 42 $1,000 debentures it tendered. This court will hear evidence on the issue of damages at a time to be fixed by the undersigned.

Settle interlocutory judgment on notice.