**MITSUI & CO. (U.S.A.), INC., Plaintiff,**

v.

**PUERTO RICO WATER RESOURCES AUTHORITY, Defendant.**

**Civ. No. 76–1393(PG).**

United States District Court,
D. Puerto Rico.

Nov. 10, 1981.

---

Fiddler, González & Rodríguez, San Juan, P. R., Ronald A. Cohan, Los Angeles, Cal., Rafael Rodríguez-Lebrón, San Juan, P. R., Kenneth Bowlin, San Antonio, Tex., Debevoise & Plimpton, New York City, for plaintiff.

Luis A. Lugo, Jr., San Juan, P. R., Kenneth M. Cushman, Philadelphia, Pa., Alberto Picó, San Juan, P. R., Donald B. Lewis, Philadelphia, Pa., for defendant.

OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

I

On November 3, 1976, MITSUI & CO. (U.S.A.), INC., (Mitsui USA) filed suit against the Puerto Rico Water Resources Authority (PRWRA),[1] a public corporation of the Commonwealth of Puerto Rico, to recover damages arising out of construction of a fossil fuel power plant (the Aguirre Project), located in Aguirre, Puerto Rico. The complaint alleges that Mitsui USA and PRWRA entered into a contract (the Prime Contract) whereby Mitsui USA agreed to build the plant for PRWRA; that PRWRA breached various contractual and other duties in both a fraudulent and negligent manner; and, that Mitsui USA is entitled to recover damages on theories of breach of contract and warranty, breach of duties of good faith and fair dealing, fraud, deceit, misrepresentation, quantum meruit and unjust enrichment.[2]

All, or most, of the construction work was subcontracted to Taihei Dengyo Kaisha Ltd. (TDK). TDK, in turn, issued a subcontract to Taihei Caribe, Inc., (TCI) its wholly owned subsidiary, which performed much of the actual construction work. Any damage award will belong to TDK.[3]

PRWRA moved for a separate trial on the issue whether Mitsui USA is the "proper plaintiff" and argued that Mitsui USA is not because it seeks to recover for damages suffered by TDK even though it has no liability to compensate TDK for such damages.[4] On August 7, 1978, it was ordered

1. When suit was commenced, the name of defendant was Puerto Rico Water Resources Authority. Its name was changed to Puerto Rico Electric Power Authority. We will, however, continue using the name PRWRA since none of the parties have indicated a contrary desire and they have used the old name in their written and oral presentations to the Court.

2. The complaint states claims under civil law doctrines for relief based on breach of contract (including potential nullity based on fraud and deceit), tort and quasi-contract found in our

Civil Code, Title 31 of the Laws of Puerto Rico Annotated (L.P.R.A.).

3. TDK agreed to indemnify TCI for all losses sustained during the project by its "Letter of Indemnify" dated January 1, 1971. TDK has honored that agreement by reimbursing TCI for its losses on the Aguirre Project. Hence, although TCI suffered a substantial portion of the damages claimed by Mitsui USA, the actual recovery is sought for TDK.

4. In its motion for a separate trial on Mitsui USA's standing to prosecute this action,

that a separate trial be held on the issue of the "role Mitsui [USA] played in the construction of the Aguirre Project and its standing to bring this suit".[5]

Mitsui USA then filed a motion, and PRWRA filed a cross-motion, for summary judgment on all separate trial issues. Both parties assert that each of them are entitled to summary judgment as a matter of law based on uncontroverted facts. After studying the extensive evidentiary record, we agree that the essential facts are undisputed and that all conflicting evidence relates solely to immaterial issues.[6]

After lengthy briefs were filed, extensive oral argument was held on April 15, 1980, pursuant to request of the parties. At the hearing, PRWRA requested leave to file a further brief in support of its position that *Blair, supra,* is inconsistent with the law of Puerto Rico, and, therefore, it should not be applied so as to permit Mitsui USA to maintain this action as the so-called "proper plaintiff". We granted both parties 10 days to file briefs on this question after which we had expected the motions for summary judgment to be ready for submission. This was not the case, and, all through 1980 and 1981, both parties have continued to supplement their written arguments.[7]

We are now ready to rule. But, before doing so, we will set forth a general statement of facts. This will be followed by a discussion of the arguments advanced by the parties including references to additional specific facts as may be necessary.

## II

In late 1969, Mitsui USA became interested in submitting a bid for construction of the Aguirre Project. After some investigation and discussion, the two Mitsuis agreed that Mitsui Ltd would invite TDK to assist in preparing the bid and to participate in negotiations with PRWRA on the condition that if the bid were successful, TDK would receive a subcontract for the construction work. Mitsui Ltd, acting for itself and Mitsui USA, invited TDK to participate on that basis, and TDK accepted.

Thereafter, various meetings were held between representatives of PRWRA, Mitsui USA, Mitsui Ltd, and TDK. PRWRA knew, or had reason to know, the corporate affiliation of representatives of Mitsui Ltd. PRWRA also was aware that Mitsui USA was not itself in the construction business and had not previously acted as a .prime contractor or general contractor; that Mitsui Ltd had had extensive experience as a prime contractor in large construction projects including power plants. It was also told that Mitsui Ltd intended to work with, and assist, Mitsui USA on the Aguirre Project.

PRWRA was told that TDK would be the subcontractor responsible for all, or substantially all, of the construction on the Aguirre Project if Mitsui USA were the successful bidder. PRWRA reviewed the extensive power plant construction experience and other qualifications of TDK and approved it as a subcontractor. PRWRA

PRWRA contended that *Severin v. United States,* 99 Ct.Cl. 435 (1943), rather than *United States v. Blair,* 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039 (1944), controls.

5. At that time, this case was presided over by the Honorable José V. Toledo, Chief Judge. Judge Toledo died in February of 1980. Prior to his death, the undersigned had managed this action as United States Magistrate. In December 1979, the undersigned became a United States District Judge and this case was reassigned to him.

6. Although there is no specific procedure in the Federal Rules of Civil Procedure for raising a "proper plaintiff" objection, the method of presentation used by the parties herein seems entirely proper and sufficient for the Court to examine and dispose of the issue without necessity of a trial under Fed.R.Civ.Proc. 42(b), as originally envisioned by Judge Toledo. See, generally, 6 Wright and Miller, Federal Practice and Procedure, Section 1554, pp. 700–701 (1971) and Authorities Cited. See, also, Text, *infra,* at 792.

7. The most recent supplement was filed by PRWRA on May 27, 1981, and consisted of an Informative Motion making reference to a deposition taken of one of the affiants involved in Mitsui USA's Motion for Summary Judgment. We deem the last filing to be immaterial to our decision.

also approved the qualifications of Mitsui USA to bid.

On May 19, 1970, Mitsui USA submitted its bid which was primarily based on cost estimates prepared by TDK. The bid identified TDK as the principal proposed subcontractor for the construction work and included a construction schedule which showed on its face that it had been prepared by TDK, a lengthy list of projects which TDK had built, and a brochure describing TDK's power plant experience. Also included in the bid package were Mitsui Ltd's 1969 Annual Report and Financial Statement and a brochure describing the relationship between Mitsui USA and Mitsui Ltd.

Mitsui USA was the low bidder. PRWRA's Committee of Awards referred to both "Mitsui & Co. (USA)" and "Mitsui & Co." in its recommendation, described the latter as "an internationally well known contracting firm [which is] . . . very capable of performing this type of construction", and concluded that the award should be made to Mitsui USA. On June 29, 1970, PRWRA and Mitsui USA executed a contract which provided that all documents submitted with the bid became a part thereof.

The parties have agreed, for purposes of these motions, that Mitsui USA and Mitsui Ltd executed an agreement dated July 10, 1970, (the "USA-Ltd Agreement"). In substance, the agreement provides that, as between the two Mitsuis, Mitsui Ltd would "perform all the works required for the completion of the Contracted Work at Aguirre . . . in accordance with the provisions in the Prime Contract", except for certain services to be rendered by Mitsui USA at its own expense. Mitsui USA agreed to pay the entire contract price ($29,945,000) to Mitsui Ltd as it received payment from PRWRA. Mitsui Ltd also agreed to pay Mitsui USA a "commission" for the services which it was to perform.

The USA-Ltd Agreement did not purport to assign, or otherwise extinguish, any of Mitsui USA's rights against, or obligations to, PRWRA. It expressly stated that it is to be effective "only between" the two Mitsuis; that all performance due PRWRA is to be rendered "under the name of Mitsui NY"; that only Mitsui USA will have the right and the obligation to collect payments from PRWRA; and, that the various provisions of the agreement are to be effective only "to the extent that this contract will not contravene or conflict with Article 22 of the Prime Contract". It was also agreed that Mitsui Ltd would indemnify Mitsui USA against, and hold it harmless from, any loss arising from the Aguirre Project. PRWRA was not given a copy of the USA-Ltd Agreement or otherwise informed of the contractual arrangement between the Mitsuis. PRWRA never asked for such information.

Mitsui Ltd and TDK executed an agreement dated July 10, 1970, (the Ltd-TDK Agreement) whereby TDK assumed responsibility for performing substantially all of the construction work on the Aguirre Project. The Ltd-TDK Agreement implemented the agreement described above between the Mitsuis and TDK which provided that the latter would receive a subcontract if Mitsui USA became the successful bidder. It was also consistent with PRWRA's understanding that TDK would be a subcontractor having substantially all construction responsibility.

Construction started in August 1970. TDK and TCI executed a subcontract dated as of January 1, 1971. The actual construction work was performed by TDK and TCI with PRWRA's knowledge and approval.[8]

Mitsui Ltd rendered advice and counsel to, and assisted, Mitsui USA during construction. It supplied personnel who became employees and agents of Mitsui USA, assisted in the procurement of materials and equipment from Japan, and performed various other services in connection with the Aguirre Project. Representatives of Mitsui Ltd and PRWRA had many direct contacts with each other through correspondence and meetings. Numerous letters and

8. See note 3, *supra.*

other written communications which Mitsui USA sent to PRWRA showed copies going to Mitsui Ltd. On at least two occasions, PRWRA wrote Mitsui Ltd directly asking it to cause Mitsui USA to cure alleged defects of performance.

Mitsui USA performed the duties required of a prime contractor as set forth in the Prime Contract. These included supplying performance and payment bonds, insurance and financing. It also discharged its duty of supervision ("[s]uperintendence") under the Prime Contract, which required it to "keep on the work ___ a competent Superintendent", by appointing Mr. Yasuo Koike as "Project Superintendent". PRWRA knew Mr. Koike was President of TCI and affiliated with TDK. He had no employment or other affiliation with either of the Mitsuis before the Aguirre Project. He performed Mitsui USA's duty of supervision as its agent.

There were substantial cost overruns during the Aguirre Project. Mitsui USA handled the preparation and presentation of claims for cost overruns to PRWRA with the assistance and participation of representatives of Mitsui Ltd, TDK and TCI. Although these claims were made by Mitsui USA in its name, PRWRA knew that they were for extra payments due to, or damages incurred by TDK or TCI. PRWRA considered that it was negotiating solely with Mitsui USA even though representatives of Mitsui Ltd, TDK and TCI attended claims meetings. It paid more than $8,000,-000.00 on account of such claims and considered them to be the "claims of Mitsui USA".

All Prime Contract change orders were executed by PRWRA and Mitsui USA. All payments by PRWRA were made by check payable to Mitsui USA. Mitsui USA deposited all payment checks in its general bank account, and, thereafter, distributed the proceeds. PRWRA never made a payment to Mitsui Ltd, TDK or TCI.

The uncontradicted affidavit of Mr. Sachio Taniguchi[9] establishes that the two Mitsuis "contemplated from the beginning that, in accordance with standard practice in the construction trade, Mitsui USA would retain, and it did retain, full responsibility for all the usual administrative duties of the prime contractor, including the duties . . . , to receive all payments from PRWRA and to present and prosecute against PRWRA any claims by Mitsui USA or any of its subcontractors for additional compensation that might result from changes, extra work or non-performance by PRWRA of its obligations under the Prime Contract". (Par. 13, pp. 8–9). The USA-Ltd Agreement is consistent with this intention and practice.

During the five years the Aguirre Project was under construction, Mitsui USA processed claims against, and received payment from PRWRA. The USA-Ltd Agreement is not ambiguous in this respect. But, if it were, this unbroken course of conduct establishes the meaning and interpretation both Mitsuis gave to the contractual arrangement between them and demonstrates that prosecuting such claims was Mitsui USA's continuing responsibility.

After completion of the project, PRWRA rejected liability on all unpaid claims. Being dissatisfied with PRWRA's rejection, TDK told Mitsui USA of its desire to sue PRWRA. Mitsui USA responded that it would sue if TDK would "agree to not seek damages from Mitsui USA for its losses and those of TCI resulting from the Aguirre Project" and if TDK would arrange for repayment of certain loans which Mitsui USA had made to TCI. TDK accepted those terms.

As a result, a written agreement dated September 14, 1976, (the "Pre-litigation Agreement") was executed by Mitsui USA and TDK whereby Mitsui USA agreed to bring this action. The Pre-litigation Agreement provided that TDK "will not for

---

**9.** Mr. Taniguchi was the manager of Mitsui Ltd, Second Electrical Equipment Export Section, in the main office of the company in Tokyo, Japan, when Mitsui USA bid on the Aguirre Project. His affidavit is attached as Exhibit "B" to Mitsui USA's Motion for Summary Judgment.

whatever reason or cause, seek damages from Mitsui USA, nor hold Mitsui liable in any way for the results of this litigation". It also provided for repayment of the loans described above.

Under the Ltd-TDK Agreement, Mitsui Ltd was obligated to "negotiate and decide upon" the apportionment of any losses or extra costs incurred by TDK which might ultimately remain uncompensated by PRWRA. That provision was intended to impose, and was interpreted by the parties as imposing, an obligation on Mitsui Ltd to bear a fair share of any losses suffered by TDK. At the request of TDK, Mitsui Ltd voluntarily agreed to make such payment before the end of this litigation and it paid approximately $2,000,000.00 to TDK pursuant to Letter Agreement dated June 14, 1977. However, that agreement and payment was not intended to modify or affect the obligation of Mitsui USA to prosecute this action and it has continued to do so.

### III

Our analysis of the question whether Mitsui USA may properly prosecute this action starts with Fed.R.Civ.Proc. Rule 17(a), which states in pertinent part that "every action shall be prosecuted in the name of the real party in interest".[10] The effect of this language is that the action "must be brought by the person who, according to the governing substantive law, is entitled to enforce the right" and "directs attention to whether plaintiff has a *significant interest* in the particular action he has instituted". 6 Wright and Miller, Federal Practice and Procedure, Section 1543, at 643, and Section 1542, at 639 (1971). (Emphasis supplied).[11]

■ The action does not have to be brought by one who will ultimately benefit from the recovery. The second sentence of Rule 17(a) describes several types of persons who are real parties in interest even though they will not benefit from any judgment. Moreover, the enumeration in Rule 17(a) "is not meant to be exhaustive and anyone possessing the right to enforce a particular claim is the real party in interest even though he is not expressly identified in the rules and is not beneficially interested in the potential recovery". Id. Section 1543, at 644–45.

The requisite "right to enforce", and "significant interest" in, the right or action for Rule 17(a) purposes has been held to exist in situations where the plaintiff was an agent, had a possessory or other interest in property or was a contracting party permitted to sue by trade custom. We will now discuss each of these approaches and their application to this case.

■ Numerous cases have held under Rule 17(a) that an agent who has contracted in his own name for a disclosed or undisclosed principal, or who acted as an agent during the course of the transaction involved in the litigation, may sue for damages suffered by the principal. Such an agent is a proper plaintiff even though the damages were sustained by another, he claims no financial interest in the transaction or litigation, and even though he did not have title to, or more than a transient possessory or custodial interest in, the property forming the subject of the dispute. *Prevor-Mayorsohn Caribbean, Inc. v. Puerto Rico Marine Management, Inc.*, 620 F.2d 1, 4 (1 Cir. 1980); *Bache & Co. v. International Controls Corp.*, 324 F.Supp. 998, 1004–05,

**10.** Rule 15.1 of the Rules of Civil Procedure for the General Court of Justice of the Commonwealth of Puerto Rico of 1979 (hereinafter P.R. Civ.Proc. 15.1) is patterned after the federal rule and provides:

"Every action shall be prosecuted in the name of the person that by law has the right being claimed, but a person authorized by law may sue without joinder of the party for whose benefit the claim is being made. No action shall be dismissed because it is not being prosecuted in the name of the party

that by law has the right claimed, until after objection is made, a reasonable time has been granted for the person that has the right being claimed to ratify the filing of the suit or join the same or be substituted instead of the complainant, and said ratification, joinder or substitution shall have the same effect as if the suit would have been filed by the person having the right."

**11.** To the same effect, see 3A Moore's Federal Practice, Section 172, p. 1703 (2d Ed., 1979).

supplemented at 339 F.Supp. 341, aff'd. 469 F.2d 696 (2 Cir., 1972). See also, 6 Wright and Miller, Federal Practice and Procedure, Section 1549, at 680, and cases cited at footnotes 83–84. This result is based on the broad construction given to the term "express trust" under Rule 17(a) which "goes far beyond any common law notion of trustee", 3A Moore's Federal Practice, Section 17.12, at 17–156.[12]

During the Aguirre Project, Mitsui USA was or became the agent of TDK for purposes of presenting claims to, negotiating claims with, and collecting money from PRWRA. The Pre-litigation Agreement carries forward the same conduct and status concerning this litigation. PRWRA does not dispute that Mitsui USA had full authority during the job to bind TDK and TCI. Indeed, it asserts that the payments of more than $8,000,000.00 which it made on claims submitted by Mitsui USA in its name are binding as an "accord and satisfaction".

The mere possessory interest of a consignee in cargo was held to be a "sufficient interest" so as to permit it to maintain an action for damages thereto in *Prevor, supra.* (620 F.2d at 4). The broker who tendered securities in its name for its customers as their agent was held to be the real party in interest entitled to sue on their behalf in *Bache, supra.* (324 F.Supp., at 1004–05).

■ The facts in the instant case are far stronger than in *Prevor* or *Bache, supra.* Mitsui USA was a party to the Prime Contract from its inception and at all times thereafter. It had an actual ownership, not a mere possessory interest in the Prime Contract and funds received thereunder. But, for the release set forth in the Pre-litigation Agreement and the continued prosecution of this action pursuant to that agreement, Mitsui USA would be liable to TDK for its losses under 22 L.P.R.A., Chapter 3, Sections 41–60, particularly Section 51.[13] Thus, Mitsui USA clearly has a significant interest in the outcome of this action and its subject matter.

■ It is also proper to consider business customs and practice in determining whether a plaintiff is the real party in interest under Rule 17(a). In *Prevor* the court looked to, and applied, the long established "Admiralty Practice" which allows a consignee to sue for damages suffered by consignor. By a parity of logic, the practice in the construction industry should also be considered in this case.

■ The uncontradicted testimony of Mr. Taniguchi establishes that the custom and practice in the construction industry permits a prime contractor to sue for damages suffered by a subcontractor. He states in paragraph 13 of his affidavit that "in accordance with standard practice in the construction trade", Mitsui USA retained full responsibility for all of the "usual administrative duties of the prime contractor" including the duty to "present and prosecute against PRWRA any claims by Mitsui USA

---

12. As we have pointed out in Note 10, *supra,* the Puerto Rican "real party in interest" procedural rule, P.R.Civ. Proc. 15.1, is susceptible of an equally broad construction. In 1979, the Advisory Committee incorporated into the prior rule, (Rule 15.1 of 1958), language taken from Rule 17(a) to the effect that an objection that a plaintiff is not the real party in interest, shall *not* be a ground for dismissal. Its amendment mirrors, therefore, from the point of view of Commonwealth Law, the same liberal attitude towards "real party in interest questions" reflected in Rule 17(a).

13. These Sections generally govern the rights and liabilities of contractors and their bondsmen in Public Works Contracts executed in Puerto Rico. Section 51, in pertinent part provides as follows:

"Every person, natural or artificial, who has worked as a worker or employee on, or who has supplied, sold, or delivered material equipment, and tools for, the work referred to under Section 47 of this Title [construction, reconstruction, enlargement, alteration or preparation of any public work], with regard to which work the bond required by Sections 47–58 of this Title has been posted, and who has not been paid in whole or in part...his salaries or wages, or the price of the materials, equipment and tools sold, delivered, or supplied for the work, shall have the right to file suit...against the Contractor...for recovery of any amount which may for such reason be owing him."

or any of its subcontractors for additional compensation".

Under civil law, custom and practice is recognized as a relevant source of law when a statute does not specifically apply to a particular situation. Thus, in *International General Electric Puerto Rico, Inc. v. Concrete Builders of P. R., Inc.,* ___ P.R.R. ___, 104 D.P.R. 871, 873–874 (1976), the Supreme Court of Puerto Rico said:

> "In the huge field of contracting and of the spiritual juridical construction, the objects of law are not restricted by the orthodox forms or by the classical lineaments. . . . Our civil code, in wise anticipation that it could not spell a just provision in each one of its articles for the expansive birth and development of new modalities in obligations, insufflated and emphasized effectiveness to the text adopted from Art. 6 of the Spanish Civil Code which in Art. 7 of Puerto Rico (31 L.P.R.A. 7) orders:
>
> ". . .When there is no statute applicable to the case at issue, the court shall decide in accordance with equity, which means that natural justice, as embodied in the general principles of jurisprudence and in accepted and established usages and customs, shall be taken into consideration." (Translated opinion at 1–2).

Article 6 of the Spanish Civil Code reads:

> "Where there is no statute exactly applicable to the point at issue, the customs of the place shall be applied and, in default thereof, the general principles of law." [14]

*Prevor,* an admiralty case, is specially persuasive on this issue given the affinity between maritime and civil law. See, generally, 1 Benedict on Admiralty, Section 15, at 1–33; 2 C.J.S., Admiralty, at 91. The reliance by *Prevor* on business customs and practices is in accord with the civil law principle that the parties to a contract may establish the law applicable thereto (the "law of the contract"), provided there is no violation of strong public policy. The famous commentator *Manresa* cites and quotes from a number of Spanish Supreme Court decisions establishing that breach of contract matters are to be decided by the laws the parties have established in their contract which becomes the "law of the case". 8–1° Manresa, Comentarios al Código Civil Español, at 50–56 (5th Ed., 1950); See, *Olazabal v. U. S. Fidelity,* ___ P.R.R. ___, 103 D.P.R. 448, 462 (1975), and cases cited.

Article 533–2 of the Spanish Code of Civil Procedure provides in pertinent part that a defendant can raise as a preliminary matter in abatement the "lack of standing ('falta de personalidad') in the plaintiff because of lack of a sufficient capacity to appear in Court or because he has not established the grounds or power upon which he is suing". As far back as July 2, 1888, reiterated in the Judgments of May 31, 1904, and October 3, 1911, the Supreme Court of Spain interpreted and applied this provision to decide a standing to sue question between parties to a contract and held: "Those who as parties enter into ('intervienen') in a contract have standing to enforce in Court its fulfillment." [15]

---

**14.** In addition to this general statutory reference, there are other more specific references in the Civil Code to practice, custom and usage in the context of a contractual relationship. Article 1210, 31 L.P.R.A. 3375, for example, indicates that "contracts. . .are binding, not only with regard to the fulfillment of what has been expressly stipulated, but also with regard to all the consequences which, according to their character, are in accordance with good faith, *usage,* and law". (Emphasis supplied). Custom also plays an important role in contract interpretation for, as Article 1239, 31 L.P.R.A. 3477 says, "the *uses* or *customs* of the country shall be taken into consideration in interpreting ambiguity in contracts, supplying

in the same the omission of stipulations which are usually included". (Emphasis supplied). Finally, in a construction contract setting, custom and practice play an important role in the flexible dealings among all parties involved, which explains in part the Code's scanty regulation of this type of contract. See, *infra,* at p. 785 and note 22 at page 786. See also, *Municipality of Vega Baja v. Smith,* 27 P.R.R. 582, 589 (1919). (As in the Common Law, "Custom is equally the basis and the life of the Civil Law".)

**15.** The Supreme Court of Spain has placed primary emphasis, especially in a contractual context, on reciprocal dealings between parties, rather than their having suffered actual dam-

Articles 1044 and 1209 of the Puerto Rico Civil Code, 31 L.P.R.A., Sections 2994 and 3374, embody the general policy that only the parties to a contract are entitled to enforce its provisions against each other. This accords with the civil law rule that parties to a contract have standing to sue each other. See, Judgments of the Supreme Court of Spain, of July 2, 1888, May 31, 1904, and October 3, 1911. Commonwealth substantive law underscores contractual position as the pivotal element for standing to sue when it provides in its Civil Code Agency Provisions that, in the case of a contract for an undisclosed principal, *only* the agent remains liable to the other party. Article 1608, 31 L.P.R.A. 4429.

We conclude our discussion of Rule 17(a) by noting that:

"The basic purpose of Rule 17(a)'s insistence that every action be prosecuted in the name of the real party in interest is to protect a defendant from facing a subsequent similar action brought by one not a party to the present proceeding and to ensure that any action taken to judgment will have its proper effect as res judicata."

*Prevor, supra,* 620 F.2d, at 4. See, 6 Wright and Miller, Federal Practice and Procedure, Section 1543, at 644; 3A Moore's Federal Practice, Section 17.01 [8], at 17–9.

PRWRA has not questioned the *res judicata* effect of any judgment. This action has been brought pursuant to the Pre-litigation Agreement. TDK has been in control of the proceedings and it has actively participated therein. Clearly, this purpose of Rule 17(a) will be satisfied by any judgment herein. *García v. Hall,* 624 F.2d 150 (10 Cir., 1980); *Motta v. Resource Shipping & Enterprises Co.,* 499 F.Supp. 1365, 1369–1371 (S.D.N.Y., 1980); Cf. *Pan American Match, Inc. v. Sears, Roebuck and Co.,* 454 F.2d 871 (1 Cir., 1972); *Aerojet-General Corporation v. Askew,* 511 F.2d 710 (5 Cir., 1975).

## IV

Federal and State courts have almost unanimously permitted "pass through" claims of the type brought here by Mitsui USA to be prosecuted by the prime contractor for the benefit of injured subcontractors. In *United States v. Blair,* 321 U.S. 730, 737–38, 64 S.Ct. 820, 823–24, 88 L.Ed. 1039 (1944) the Supreme Court stated the basis for this rule as follows:

"Respondent [prime contractor] was the only person legally bound to perform his contract with the government and he had the undoubted right to recover from the government the contract price for the [work]...whether that work was performed personally or through another. This necessarily implies the right to recover extra costs and services wrongfully demanded of respondent under the contract, regardless of whether such costs were incurred and such services were performed personally or through a subcontractor. Respondent's contract with the government is thus sufficient to sustain an action for extra costs wrongfully demanded under that contract."

This method of adjudicating pass through claims has now become so accepted that it has been described as the method by which such claims are "routinely entertained". *Owens Corning Fiberglas Corp. v. United States,* 419 F.2d 439, 454–455 (Ct.Cl. 1969); *Ardsley Construction Co. v. Port of New York Authority,* 61 A.D.2d 953, 403 N.Y. S.2d 43, 45 (1978).

*J. W. Terteling & Sons v. Central Nebraska Pub. P. & I. Dist.,* 8 F.R.D. 210, 213–14 (D.Neb., 1948) held that a prime contractor was the real party in interest under Rule 17(a) and entitled to prosecute such claims. The Court denied a motion to dismiss under Rule 17(a) and said:

"If there are valid claims of the character and origin alleged, the plaintiff [prime contractor] alone, and not the subcontrac-

ages, as the cornerstone of standing for one party to maintain an action against another. See, generally, II Medina & Marañón, Civil Laws of Spain (Leyes Civiles de España), Code of Civil Procedure, promulgated Feb. 3, 1881, effective April 1, 1881, pp. 199–201 (12 Ed.-Reus. Madrid, Spain); Cf. *Cámara Insular v. Anadón,* 83 P.R.R. 360, 369, n. 5 (1961).

tors, may prosecute them against the defendant."

"The plaintiff [prime contractor] is . . . prosecute[ing] an action upon claims against the defendant, which, if they, or any of them, possess objective merit, are within its formal ownership and power of enforcement, quite irrespective of the channels through which, if successful, it will have finally to distribute the fruits of the litigation."

"The jurisdiction of the court over the claims of the plaintiff against the defendant under the prime contract is not defeated by the incidental obligation of the plaintiff to account to the subcontractors for the proceeds of the suit in the event of its recovery."

See also, *Owens-Corning Fiberglas Corporation v. United States, supra,* 419 F.2d, at 453–455 (Ct.Cl., 1969); and *Buckley & Co., Inc. v. State,* 140 N.J.Super. 289, 356 A.2d 56, 73–74 (1975), holding that prime contractors have "standing" to sue.

*Blair* held that the contract between the plaintiff and the government was, standing alone, "sufficient to sustain an action" by the prime contractor for losses incurred by the subcontractor. *Terteling* reached the same result because the claims being asserted by the prime contractor were "within its formal ownership and power of enforcement" and its right to sue was not "defeated by the incidental obligation of the plaintiff to account to the subcontractors for the proceeds" of any recovery. Other courts have held that the damages and claims of subcontractors are owned by, or belong to, the prime contractor for purposes of permitting the prime to assert pass-through claims. See, *Kensington Corp. v. State,* 74 Mich.App. 417, 253 N.W.2d 781, 785 (1977). ("The subcontractor's damages in essence, have become the damages of the prime contractor . . ."); *Owens-Corning Fiberglas Corp. v. United States, supra,* 419 F.2d, at

454; *J. L. Simmons Company v. United States,* 304 F.2d 886, 888 (Ct.Cl., 1962).

Mitsui USA is also a party to the prime contract. The claims it asserts are within its formal ownership and power of enforcement. Its position is in all material respects the same as that of the plaintiff-prime contractors in the cases cited above.

However, PRWRA contends that *Blair* is not applicable because of the *Severin* doctrine and because it is contrary to civil law. These points will now be considered separately.

■ In *Severin v. United States,* 99 Ct.Cl. 435 (1943), the United States Court of Claims held that a prime contractor would not be allowed to recover for losses suffered by its subcontractor where the subcontract contained an express provision releasing the prime contractor from all liability to the subcontractor for any loss or damage caused by the owner.

An extended discussion of *Severin* and its history is unnecessary to this opinion. To start with, *Severin* has a "built-in" limitation which renders its rationale and holding inapplicable to the case at bar. This limitation is found in the following language used by the Court in reaching its decision:

"(P)laintiffs did have a contract with the government. That contract was breached. *That breach might, if the contract had been one between private persons,* have given rise to a right to win a suit, and to recover nominal damages, even if no actual damages resulted from the breach. But the futile exercise of suing merely to win a suit *was not consented to by the United States* when it gave its consent to be sued for its breach of contract. (Citations omitted)" (Emphasis supplied) 99 Ct.Cl., at 443.

The instant case is between private persons [16] based on breach of contract and

<hr>

**16.** Although PRWRA is an instrumentality of the Commonwealth of Puerto Rico, its enabling Act makes it clear that "it is a corporation having legal existence and personality separate and apart from that of the government" and that PRWRA's debts and obligations are not

those of the government. 22 L.P.R.A. 193(b). In any event, as a matter of Commonwealth substantive law, which governs the contractual rights of the parties herein a contract executed between a government and an individual must be construed as if it were one between individ-

hence it falls outside the *Severin* holding, which basically rests, as the above quoted language shows, on a strict construction of the federal government's consent to be sued.

Further, *Severin*'s author has stated that it was ill-advised and should be overruled. See, e.g., *Continental Illinois National Bank & Trust Co. v. United States*, 81 F.Supp. 596, 599 (Ct.Cl., 1949). In practically every case where its application has been urged, an exception has been created or recognized. The Court of Claims has avoided applying *Severin* so as to preclude recovery in every case arising in that court during the past twenty five years. Cf. *Blount Bros. Construction Co. v. United States*, 348 F.2d 471 (Ct.Cl., 1965); and *G. L. Christian & Associates v. United States*, 312 F.2d 418 (Ct.Cl., 1963).

PRWRA points out that Mitsui Ltd agreed to indemnify Mitsui USA against loss on the Aguirre Project. It contends that the indemnity agreement is the equivalent of a release under *Severin* and that a prime contractor is barred from suing where it has no risk of loss.

However, to "come under the *Severin* doctrine, the defendant must show, through some contractual term or a release, that the plaintiff—prime is not liable to the subcontractor". *Southern Construction Co. v. United States*, 364 F.2d 439, 447 (Ct.Cl., 1966); *Blount Bros. Construction Co. v. United States*, 346 F.2d 962, 965 (Ct.Cl., 1965); *J. L. Simmons Co. v. United States*, 304 F.2d 886, 889–90 (Ct.Cl., 1962). Further, the agreement releasing the prime contractor must be express—it cannot rest on inference. *J. L. Simmons, supra*, Id., ("no express exculpatory clause"); *Kensington Corp. v. State, supra*, 253 N.W.2d, at 783, ("clear, express exculpatory" language required). *Kaiser Industries Corporation v. United States*, 340 F.2d 322, 336 (Ct.Cl., 1965); *Donovan Construction Co. v. United States*, 149 F.Supp. 898, 900 (Ct.Cl., 1957); *Keydata Corporation v. United States*, 504 F.2d 1115, 1121 (Ct.Cl., 1974); *St. Paul Dredging Co. v. State*, 107 N.W.2d 717, 725

uals. *Zequeira v. U.H.R.C.*, 83 P.R.R. 847, 849

(1964), (quoting *Blair*) and *Blair, supra*, at 321 U.S., at 737, 64 S.Ct. at 823.

As stated in *Cross Construction Company, Inc. v. The United States*, 28 C.C.H. 86,021, Case No. 80–718 (Ct.Cl., September 19, 1980):

"This court has refined the *Severin* doctrine so that it requires an *iron-bound release or contract provision* immunizing the prime contractor completely from any liability to the sub. . . .

"In this case we are pointed to no contract clause or document absolving Folk from all liability to Cross. The mere fact that Cross dismissed its suit against Folk, even if it be considered a dismissal with prejudice, does not necessarily mean that *Simmons* is inapplicable and that Cross has no right to demand any money Folk may recover from the Government in the present suit. Defendant (on whom the burden rests) has not made the *strict* kind of case it must if we are to apply the *Severin* doctrine as it exists in today's world." (Emphasis supplied)

In this case, there is no exculpatory clause or release of any kind between TDK and Mitsui USA. If a prime contractor obtains an indemnity agreement from a third party, its liability to the subcontractor is not affected. The subcontractor is not a party to, or bound by, any such agreement and has *every right to sue* the prime contractor directly and recover if he can. The indemnitor may assert defenses or be insolvent. Thus, any indemnity agreement from Mitsui Ltd in favor of Mitsui USA is not a basis for invoking *Severin*. It is not even the equivalent of the dismissal with prejudice in *Cross, supra*, much less the "express" "iron-bound" release required for application of the *Severin* doctrine.

■ However, even if we assume that TDK had released Mitsui USA from all liability, nevertheless, there are at least three other exceptions to the *Severin* doctrine which make it inapplicable to this case. The first exception is the rule that a release or exculpatory clause will not bar

(1961).

prosecution of pass-through claims by the prime contractor where he also has an agreement with the subcontractor which permits him to sue the owner for the subcontractor's losses and provides for payment of any recovery to the subcontractor. See, *Donovan Construction Co. v. United States, supra,* 149 F.Supp., at 900; *Owens-Corning Fiberglas Corp. v. United States, supra,* 419 F.2d, at 457; *Keydata Corp. v. United States, supra,* 504 F.2d, at 1120–21; *J. L. Simmons Company v. United States, supra,* 304 F.2d, at 889; *Barnard Curtiss Co. v. United States,* 301 F.2d 909, 913 (Ct.Cl., 1962); *Robert E. McKee v. City of Atlanta,* 431 F.Supp. 1198, 1200–1201 (N.D.Ga., 1977); *Kensington v. State, supra,* 253 N.W.2d, at 783–784; *Buckley and Co., Inc. v. State, supra,* 356 A.2d, at 74; *Ardsley Construction Co. v. Port of New York, supra,* 403 N.Y.S.2d, at 44.

The Pre-litigation Agreement provides for the bringing of this action by Mitsui USA. In all material respects, it is similar to the pre-litigation agreements in the cases cited above.

■ *Severin* is also inapplicable if the prime contractor waives the benefit of a release by, for example, bringing suit. In *Robert E. McKee, Inc. v. City of Atlanta, supra,* the defendant argued that there was "an unconditional release" executed by the subcontractors in favor of the prime contractor, *McKee,* which extinguished the prime contractor's obligation and right to sue. The Court stated:

"The Court of Claims has held that the execution of a general release to the government will not bar the contractor from bringing claims inconsistent with the release, where the parties' actions subsequent to the release evidence either their understanding that the release does not apply to the claim or...[a] waiver of the release...(Citations omitted)." (At 1200).

*McKee* then held that:

"...[the prime contractor] McKee waived the subcontractors' release by continuing to negotiate with the City and by filing this action.... Thus, McKee is

entitled to bring... [this action] on behalf of its subcontractors...(citing *J. L. Simmons Co. v. U. S.,* 304 F.2d 886 (Ct.Cl., 1962) which contains an extensive discussion of Severin)". (At 1201).

The uncontradicted facts show that Mitsui USA made, processed and negotiated claims for subcontractors against PRWRA and has filed and prosecuted this case. Under *McKee, supra,* that consistent course of action would have amounted to a waiver of a release had there been one.

■ A recent decision has held that *Severin* does not apply if the prime contractor is only morally, even though not legally, obligated to sue. In *Timber Investors, Inc. v. United States,* 587 F.2d 472, 476 (Ct.Cl., 1978), the evidence showed that the prime contractor had no liability to the subcontractor and there was no litigation agreement permitting or requiring suit. The Court said:

"...Plaintiff, while denying any liability on its part to Reid, believes it has a moral obligation to assist its subcontractor in recovering on what it believes are just claims and will undoubtedly reimburse its subcontractor, Reid for the damage it has suffered at the hands of forest service but only as and when plaintiff receives payment for said damages from the government. Under these circumstances, such a suit by a prime contractor on behalf of its subcontractor is permissible. *J. L. Simmons Co. v. United States,* (304 F.2d 886) 158 Ct.Cl. 393 (1962);..."

Mr. Naruse stated that "Mitsui USA would have and retain both a legal and moral obligation to attempt to secure compensation for such losses (by subcontractors) from PRWRA by all means necessary" and to pay over to subcontractors all sums received from PRWRA. That evidence was uncontradicted and, under *Timber Investors, supra,* brings this case under another exception to *Severin.*

■ PRWRA also argues that *Blair* should not apply because it is contrary to the laws of the Commonwealth of Puerto Rico which are patterned after the civil law

system.[17] Specifically, PRWRA argues that the *Blair* doctrine is incompatible with Article 1209 of the Civil Code of Puerto Rico, 31 L.P.R.A. 3374, which states, in pertinent part, as follows:

> "Contracts shall only be valid between the parties who execute them and their heirs,..."

PRWRA contends that this section establishes a privity of contract rule for Puerto Rico and that the *Blair* doctrine represents an unpermitted exception to this requirement. However, our familiarity with the civil law system and our examination of civil law authorities lead us to conclude that PRWRA's position is untenable.[18]

**17.** The Prime Contract specifies that Commonwealth substantive law shall be the governing law in any dispute.

**18.** PRWRA seeks to buttress its argument on *Blair*'s inconsistency with Puerto Rican substantive law by urging this court to ignore completely, not just the *Blair* holding, but also the whole spectrum of relevant common law authority advanced by Mitsui USA for the contrary proposition. It is PRWRA's contention that the Supreme Court of Puerto Rico has prohibited recourse to common law precedent in civil actions similar to the one brought here by Mitsui USA. See, *Valle v. Amer. Inter. Ins. Co.,* ___ P.R.R. ___, 108 D.P.R. 692 (1979).

To start with, a careful reading of *Valle*—a simple tort action arising out of an automobile chain collision wherein the court was confronted with a proximate cause issue—fails to persuade us that the court has relinquished forever recourse to common law precedent. Indeed, after overruling some of its own prior precedent (dating back to the turn of the century), which indicated that the common law was to be mandatorily followed by Puerto Rican courts in civil tort actions, the court carefully pointed out that "in *appropriate cases* it shall be lawful to use the common law in its multiple and rich versions—the Anglo-Saxon, the British original, the Anglo-Canadian and others— by way of comparative law, as well as the use of examples of other juridical systems". (Our translation; emphasis supplied) 108 D.P.R., at 697.

Second, it is worthy of note, that the Court found it convenient to show the consistency of its civil law methodology and conclusion with similar results reached by mainland common law state courts. Id. at 699.

Finally, though expressly overruling prior cases to the extent they may have used common law principles to solve civil law problems, the court left untouched the following statement,—peculiarly apposite here to dispose of

The requirement of privity is not unique to Puerto Rico, and the *Blair* doctrine is not an exception to the privity requirement. On the contrary, the very purpose of the *Blair* doctrine is to preserve the concept of privity which also exists under the common law. *Owens-Corning Fiberglas Corp. v. United States, supra,* 419 F.2d, at 455, states:

> "To preserve the concept of privity, these matters are regularly brought on behalf of subcontractors by the prime contractor,...."

See also, *J. W. Terteling and Sons v. Central Nebraska Public Power & Irrigation District, supra,* 8 F.R.D., at 213; and *St.*

PRWRA's contention—found in *Municipality of Vega Baja v. Smith, supra,* note 14, recently reaffirmed in *Futurama Import Corp. v. Trans Caribbean,* ___ P.R.R. ___, 104 D.P.R. 609, 614–615 (1976):

> "Certainly, in this jurisdiction the common law is not a name to conjure with. Nor, on the other hand, need we be alarmed by the mere circumstances that any particular doctrine, if based on the bedrock of universal reason and justice, happens to be an offspring of the common law. When confronted with a case not covered by our Civil Code or other legislative enactment, we should neither fear the evil nor reject the good that is to be found in the principles of the common law or elsewhere in the experience of mankind. Few tribunals are so unfettered by precedent, or, in matters not governed by statute, so free to follow the dictates of conscience and common sense as are the courts of this Island. To build, upon the fundamental principles so often found at bottom in both American and Spanish jurisprudence, a composite structure embodying the best elements of the two great systems and, in so far as may be, unmarred by the defects of either, is our peculiar privilege if we will but grasp the opportunity that lies before us."

We know of no prior diversity case in this Court wherein the argument that *Valle* precludes resort to common law sources has been made. Indeed, both this Court and the United States Court of Appeals for the First Circuit have continued to use common law precedent as persuasive authority when no express statutory or Puerto Rican Supreme Court decisions dispose of the issues presented for adjudication. See, e.g., *Segovia Development Corp. v. Constructora Maza, Inc.,* 628 F.2d 724, 725, 726 (1 Cir., 1980); *Fireman's Fund Am. Ins. v. Almacenes Miramar,* 649 F.2d 21, 25 n.3 (1 Cir., 1981).

*Paul Dredging Corp. v. State, supra,* 107 N.W.2d, at 724.

PRWRA is not being sued by a stranger. Mitsui USA and PRWRA are parties to the Prime Contract and to this litigation. Thus, the requirements of privity have been met.

We are also unable to discern any violation of, or inconsistency with, any other Puerto Rican laws or public policy from the fact that Mitsui USA seeks to recover for damages suffered by subcontractors.

In *Ojeda v. Fernández,* 32 P.R.R. 688 (1924), a landlord's failure to repair a roof caused damage to a sublessee. No doubt because he realized that a direct action against the landlord would be precluded by the absence of privity, the sublessee obtained an assignment from the lessee of the latter's rights under the lease and brought suit as assignee of those rights against the landlord. The landlord argued that the assignment conveyed nothing because the lessee, having suffered no damage "had no existing right against the owners" which he could have assigned to the sublessee. 32 P.R.R., at 691.[19] The court rejected this argument holding that the suffering of actual damage was merely "the measure, not the basis of liability", that the lessee possessed a valid right of action under the primary lease notwithstanding the lack of any damage on his part; and, that the lessee's right of action could be enforced by the sublessee as the assignee thereof. 32 P.R.R., at 692–93.

On analysis, *Ojeda* adopts a procedure very similar to that permitted in *Blair* for upholding privity and, at the same time, passing through the claim of a party not in privity. In *Ojeda,* the injured sublessee was allowed to stand in the shoes of the lessee (who was in privity) by virtue of an assignment whereas in *Blair* the injured subcontractor simply passed through its damage claim to the prime contractor who was in privity. In both cases, the remedy for the injury and the concept of privity were preserved.

*Vanguard Construction Corp. v. Universal Construction Corp.* Civil No. 75–2431 (501), Superior Court of Puerto Rico, Bayamón Part, Judgment of January 24, 1978, Petition for Review, Denied, R–78–403, Supreme Court of Puerto Rico, December 21, 1978,[20] also illustrates the compatibility of

---

**19.** Essentially, the Court dealt with the issue whether, in a breach of contract situation, the plaintiff must have suffered damage in order to have standing to sue. The confrontation would have been direct had the lessee, instead of the sublessee, sued for the damages suffered by the latter. However, the precedential value of *Ojeda* stands intact, regardless of the actual configuration of the parties to the action or the fact that the lessee and sublessee may have chosen the alternative of an assignment rather than a pass through claim. This is because the sublessee based his suit on an assignment of the lessee's right to sue the lessor, which right existed by virtue of contract privity even though the lessor had suffered no damage.

**20.** PRWRA suggests that Rule 44(c) of the Rules of the Supreme Court of Puerto Rico of 1975, 4 L.P.R.A. App. I–A, p. 446, forbids the use of *Vanguard* as precedent. That rule only applies to unpublished Supreme Court Judgments. We feel it appropriate to follow the methodology employed in *American Eutectic Weld. Alloys Sales Co., Inc. v. Rodríguez,* 480 F.2d 223, 228 (1 Cir., 1973), where the Court, in a diversity case, considered it proper to rely on a Puerto Rican Superior Court unpublished judgment to ascertain Commonwealth law on

an issue which had not been decided by the Puerto Rican Supreme Court. The Court quoted extensively from said Superior Court judgment to sustain its reasoning.

This court has followed suit in *Cruz Ramos v. Brother Intern'l. Corp.,* 445 F.Supp. 983 (D.P.R., 1978). There, in a case involving the application of Act 75 of June 24, 1964, as amended, 10 L.P.R.A. 278, et seq., (commonly referred as the Dealer's Act) to a particular set of facts, Judge Juan R. Torruella made a comparison with a case decided by the Superior Court of Puerto Rico, San Juan Part, which bore circumstances very resemblant to his case. The court found support for its decision in the case of *Frank Munarriz v. Capt. Sylvain Ledee, Inc.,* Civ. No. 67–5799, September 14, 1977, appeal dismissed by the Supreme Court of Puerto Rico, December 20, 1977. Id. at 985.

Contrary to PRWRA's argument, we do not consider that Rule 44(c) eroded the hermeneutic approach of *American Eutectic.* We note that by 1975 when it published its Rules the Supreme Court had notice of *American Eutectic* and made no reference to Superior Court judgments in Rule 44(c). Moreover, the same day the Puerto Rican Supreme Court adopted its own rules, it also promulgated Rules for the

*Blair* and the civil law. In *Vanguard*, a subcontractor (Vanguard) filed suit against the prime contractor (Universal), who, in turn, filed a third party claim against the owner (the Commonwealth of Puerto Rico). *Vanguard* claimed damages arising from the owner's conduct, including various stop orders, three change orders, defects in the drawings and specifications, the failure of the owner to advise bidders about special conditions of the land, and delays caused by defective drawings prepared by the owner's architect, and active interference by the government in the work of the subcontractor.

The Court held at, *Conclusion of Law 18*, page 13: [21]

"There is no contractual privity between Vanguard [subcontractor] and the Commonwealth [owner] but [there is] between Vanguard and Universal [prime contractor]. Therefore, Universal as principal contractor is liable to Vanguard as subcontractor for the sum claimed in the complaint, but the Commonwealth in turn, as owner of the project, is liable to its principal contractor Universal for any sum that the latter becomes obligated to pay to Vanguard in accordance with the following judgment."

*Vanguard* clearly recognizes the right of a prime contractor who suffered no damage to sue the owner for losses sustained by a subcontractor despite the absence of privity between the owner and the subcontractor.

■ Despite *Blair, Ojeda,* and *Vanguard, supra,* PRWRA argues that pass through claims may not be maintained by a prime contractor because there is no statute in Puerto Rico which expressly permits that to be done. PRWRA has the situation reversed. Under the civil law system, that which is not expressly prohibited, is permitted. Any other rule would ignore the directive found in Article 1207 of the Civil Code of Puerto Rico, 31 L.P.R.A. 3372, that the parties to a contract may establish the stipulations they may deem convenient and necessary provided they do not contravene the law, public morals or public order. Cf. *Clausells v. Commercial Union Assurance Co.,* 37 P.R.R. 110, 111 (1927) and authorities cited. As the Puerto Rico Supreme Court has said, our Code "derives its vitality—more because of its great silences and general postulates than from its detailed provisions". *Santiago v. Sears, Roebuck,* ____ P.R.R. ____, 102 D.P.R. 515, 521 (1974). See also, *International General Electric Puerto Rico, Inc. v. Concrete Builders of P. R., Inc., supra,* Id., and Article 6, Spanish Civil Code.

*Blair* emphasizes contractual nexus, and not actual sufferance of damages, and the linchpin for a determination that one of the parties to a contract may sue the other. The civil law, as illustrated by *Ojeda* and *Vanguard,* also stresses contractual nexus, rather than actual damage, as sufficient entitlement for one party to a contract to sue the other. *Suárez v. Hernández,* 56 P.R.R. 262 (1940). See, also, Judgment of the Supreme Court of Spain of July 2, 1888, as reiterated in the Judgments of May 31, 1904 and October 3, 1911, *supra.*

■ The Civil Code of Puerto Rico characterizes construction contracts as a "Lease of Works" whereby "one of the parties binds himself to execute a work to the other...for a specified price". Articles 1434, 31 L.P.R.A. 4013. Without an express stipulation to the contrary, it is immaterial whether the contractor performs the work himself or through others. Article 1488, 31 L.P.R.A. 4129. No matter how many subcontractors there are, the only person legally bound to the owner is the prime contractor with whom the owner has contracted. As *Blair* points out, this fact "necessarily

---

Administration of the Court of First Instance of Puerto Rico (which includes the Superior Court), 4 L.P.R.A., App. II–A, pp. 454–483, and it did not include therein a provision similar to Rule 44. Finally, in 1979, when the new Puerto Rican Rules of Civil Procedure were promulgated, nothing similar to Rule 44 was included.

**21.** A certified copy of the opinion and its translation were submitted to this Court. We have independently verified that the English version is an accurate translation of the original Spanish.

786

implies" the right to recover for extra services and costs demanded of the prime contractor by the owner, regardless who may have performed the services or incurred the costs.

■ Here also, there is no conflict between the Code and *Blair* for both place the entire responsibility on the contractor, instead of the subcontractor, for completion of the job. It is this contractual nexus and responsibility which provides the doctrinal basis for permitting the prime contractor to assert his rights as a party to the contract. As *Ojeda* says, damage is "the measure, not the basis, or liability". 32 P.R.R., at 692. Who ultimately receives the recovery, is immaterial.

■ PRWRA cannot avoid the legal consequences of its having entered into a construction contract or "Lease of Works" with Mitsui USA. As Article 1210, 31 L.P.R.A. 3375 reads, such an agreement is "binding, *not only* with regard to the fulfillment of what has been expressly stipulated, but *also with regard to all consequences which, according to their character are in accordance with good faith, use and law*". (Emphasis supplied)

PRWRA would have us change by judicial fiat the very law which the parties established by mutual consent in the Prime Contract. There is ample and uncontradicted evidence in the record that, prior to entering into the Prime Contract, PRWRA knew that Mitsui USA was not a construction company, that it would be assisted by Mitsui Ltd and that TDK would have primary responsibility for actual construction. PRWRA evaluated and approved Mitsui USA's bid and experience in all respects. It had a duty to do so, for the very law of its creation, 22 L.P.R.A. 205, imposed on PRWRA the duty to consider the skill and construction experience of prospective bidders in evaluating bids and award construction contracts. How TDK received the subcontract (the result PRWRA also intended), whether directly from Mitsui USA or through a conduit such as Mitsui Ltd, is immaterial to Mitsui USA's right to prosecute this action. As we have seen in a lease of works, the consideration flowing from the contractor to the owner is the final result—the completed project.

■ It was entirely foreseeable that Mitsui USA, as prime contractor, would assert claims against PRWRA on behalf of subcontractors. That is exactly what happened during construction of the Aguirre Project even to the point where PRWRA sent letters directly to TDK concerning claims submitted by Mitsui USA, such as the letter of PRWRA to Mr. Mitsutomi, of November 6, 1975, referred to in paragraph 20 of the complaint.

■ In a construction contract, flexibility is the order of the day.[22] Mitsui USA's role concerning pass-through claims is essentially the same in this litigation as it was during the job. PRWRA cannot now reverse course by disclaiming the effect of five years of pre-litigation conduct whereby it recognized, without objection, the right of Mitsui USA to present pass-through claims.

■ During oral argument, PRWRA advanced the argument that *Blair* is inconsistent with a provision of the Puerto Rico Civil Code found in the regulation of "lease of works" (Article 1489), which permits subcontractors to bring a direct action against the owner under certain limited circumstances.[23] However, this Article was not intended to release owners from their obligations under prime contracts, to prevent prime contractors from recovering on behalf of such contractors losses generated by

---

**22.** Santos Briz, El Contrato de Obra y su Problemática Jurídica, LVI Revista de Derecho Privado 381, 384, 391 (1972) and authorities cited; Borrell Macia, Arrendamiento de Obras, 11 Nueva Enciclopedia Jurídica Española, 904–905 (Ed. Seix, Barcelona, 1950).

**23.** Article 1489, 31 L.P.R.A. 4130, provides as follows:

"Those who furnish their labor and materials in a work agreed upon for a lump sum by a contractor have no action against the owner, except for the amount the latter may owe the former when the action is brought."

a breach or as the exclusive means of accomplishing recovery of such losses. Article 1489 has no more bearing on the proper plaintiff issue than the mechanics' lien laws found in the many states which have applied the *Blair* doctrine.

 It is obvious that TDK authorized Mitsui USA to act as its agent for presentation to, and negotiation of, claims against PRWRA arising under the Prime Contract. PRWRA had ample opportunity to object to that practice had it wished to do so. In some instances it approved and paid claims and in others it rejected them—ostensibly on the merits. That course of dealing necessarily implied a recognition by PRWRA of Mitsui USA's standing to seek recovery of the claims now at stake in this suit, all in accordance with construction industry custom and practice. This pre-litigation conduct became a permanent part of the rights and obligations of Mitsui USA and PRWRA under the Prime Contract which cannot be changed unilaterally.

Therefore, we fail to perceive any genuine or material difference between *Blair* and Commonwealth substantive law which might preclude Mitsui USA from prosecuting this action. The fact that the language of *Blair* may not be identical to the wording of the Civil Code or the fact that the Code may not explicitly éstablish such a remedy, does not tend to show that the courts of Puerto Rico would refuse to entertain a complaint such as the one in this case. *Ojeda, Vanguard,* and other authorities discussed above, together with the absence of an express prohibition, all lead to the conclusion that such actions are proper under the laws of Puerto Rico. The broad spectrum of contractual liberty, characteristic of the civil law system as prevalent in Puerto Rico and Spain, precludes any inference that Code silence is the equivalent of a prohibition. *Santiago v. Sears Roebuck, supra,* Id.

## V

PRWRA also raises a potpourri of additional arguments, all revolving around the notion that Mitsui USA assigned the Prime Contract to Mitsui Ltd, thus, losing its status as prime contractor. PRWRA suggests that, thereafter, Mitsui USA continued to act as the mere agent of Mitsui Ltd hired on a commission basis. It contends that this violated Article 22 of the Prime Contract because, among other things, PRWRA did not receive the personal services of Mitsui USA for which it claims to have expressly bargained. From all of this, PRWRA concludes that Mitsui USA cannot maintain this action. It points to no facts, and cites no authorities, which support these assertions.

PRWRA bases its argument that Mitsui USA assigned the Prime Contract on the USA–Ltd Agreement. That agreement contains no words of assignment, sale or grant. It provides on its face that it is effective only as between Mitsui USA and Mitsui Ltd. Mitsui USA remained obligated, even as between the two Mitsuis, to perform various duties customarily performed by prime contractors, including the right and duty to receive payments from, and the handling of claims against, owners. Article 8 expressly provides that Mitsui Ltd "shall take responsibility against Mitsui NY for the performance of the Contracted Work in accordance with the Prime Contract to the extent that this contract will not contravene or conflict with the provisions in Article 22 of the Prime Contract".

Corbin states that an assignment has the same meaning as the terms "alienation", "conveyance" and "transfer" and that an "alienation or transfer or conveyance of 'title' is the substitution of a new party to some or to all of the legal relations of which 'title' consists. The grantor extinguishes his relations with others respecting the subject matter and creates similar relationships between the grantee and others." 4 Corbin, on Contracts, at 421–22 (1963). Corbin concludes:

"Alienation, conveyance and transfer, therefore, consist of some operative action that extinguishes and creates, that substitutes a new party as the focus of legal relations with respect to the subject matter. Such also is an 'assignment' in the law of contract." (Id., at 422)

We find no evidence that the Mitsuis intended to make an assignment of the Prime Contract. But, if they had any such intent, the attempt failed.

■ An "effective assignment is one by which the assignor's right to performance by the obligor is extinguished and the assignee acquires a right to such performance". Restatement of Contracts, Section 150, and 3 Williston On Contracts, Section 404, n. 2, p. 3 (3rd Ed., 1960). There could not have been an effective assignment unless (1) Mitsui Ltd became entitled to receive performance from PRWRA, and (2) Mitsui USA owed no further duty to PRWRA. That is, such an assignment required all legal relations between Mitsui USA and PRWRA to have been extinguished. That did not happen.

The major, if not the only, right Mitsui USA had under the Prime Contract was to receive payment of money. The USA–Ltd Agreement states that Mitsui USA retained the right to, and responsibility for, obtaining payments from PRWRA. Mitsui Ltd had no right to demand money from PRWRA. *Christmas v. Russell's Exps.*, 81 U.S. (14 Wall) 69, 84, 20 L.Ed. 762 (1871) held that this was fatal to any claim of assignment:

> "The phraseology employed is not material provided the intent to transfer is manifested. Such an intent in its execution is indispensable. The assignor must not retain any control over the funds—any authority to collect, or any power of revocation. If he does, it is fatal to the claim of the assignee. The transfer must be of such a creature that the fund holder can safely pay, and is compellable to do so, though forbidden by the assignor."

Thus, there was no effective assignment of any rights by Mitsui USA under the Prime Contract.

It is equally clear that Mitsui USA did not make an effective assignment of its duties under the Prime Contract. Any such assignment would have required the consent of PRWRA under Article 22 of the Prime Contract. Williston states " '...[n]o one can assign his liabilities under a contract without the consent of the party to whom he is liable' ", 3 Williston On Contracts. Section 411, p. 19 (3rd Ed., 1960). No such consent was given. Therefore, there was no effective assignment of any duties under the Prime Contract.

■ Even if there had been an effective assignment of the Prime Contract to Mitsui Ltd, nevertheless, Mitsui USA would still be entitled to maintain this action. See *Wiseman v. Sklar*, 104 Cal.App. 369, 374, 285 P. 1081 (1930) and *G. L. Christian and Associates v. United States*, 312 F.2d 418, 422 (Ct.Cl., 1963). The Prime Contractor was permitted to sue in both cases despite conduct which it was assumed amounted to an effective assignment.

■ Also, it is well established that an attempt to assign contract rights in violation of a statute or clause prohibiting assignment does not extinguish or forfeit those rights. It only vitiates the attempted assignment. Thus, if the USA–Ltd Agreement violated Article 22 of the Prime Contract as PRWRA argues, the only effect would be to leave all rights covered by such attempted assignment right where they have always been, i.e., in the unimpaired ownership and possession of Mitsui USA.

In *Colonial Navigation Co. v. United States*, 181 F.Supp. 237, 240 (Ct.Cl., 1960) the government urged that the action be dismissed because the claims sued on had been assigned to a third party. The Court stated:

> "But an attempted assignment of a claim against the United States does not forfeit the claim. It leaves the claim where it was before the purported assignment [by Colonial]. As to this asset, Colonial is the party in interest, and the only party whose rights the Government is obliged to regard."

See also, *Dougherty v. United States*, 18 Ct.Cl., 496, 503–4 (1883).

PRWRA argues that Mitsui USA lost its status as prime contractor because Mitsui Ltd performed all, or almost all, of its duties under the Prime Contract. This is factually incorrect as shown below. How-

ever, if we assume the Mitsui USA performed none of its duties under the Prime Contract, it does not follow that it lost its status as prime contractor or the right to sue.

The status of prime contractor is created by the mutual agreement of the owner and the contractor. That status is not affected by, and does not depend on, who actually performs the contractor's work or duties. A prime contractor cannot lose that status by unilaterally delegating responsibility for full performance to a third party without the owner's consent. That relationship is consensual in its creation and termination.

In *Beaconwear Clothing Company v. United States*, 355 F.2d 583, 590–91 (Ct.Cl., 1966), the prime contractor, entered into a subcontract with Spiotta, who performed "all the work on the (prime) contract" (583). Spiotta's claim that it had acquired the status of "prime contractor" was rejected because the government's consent was missing. The court said:

"No contract was ever entered into directly between the Government and Spiotta. Spiotta did assume responsibility, . . . for the supply of the entire contract quantity of overcoats, but defendant did not assent to Spiotta's becoming prime contractor in fact. In all aspects and throughout the performance of the contract in question, the Government insisted on recognizing only Beaconwear as prime contractor." (355 F.2d, at 590)

In holding that Beaconwear remained the prime contractor, the Court added:

"Beaconwear thus remains the only party which has a legal claim to the amount due under the contract. It alone signed the contract; all the arrangements and adjustments were negotiated and executed solely in its name and all administrative appeals were prosecuted in its

name. It was the prime contractor on contract no. TAP2020 and has been held responsible by defendant for performance at all times." (355 F.2d, at 591)

In *G. L. Christian and Associates v. United States*, 312 F.2d 418 (Ct.Cl., 1963), all duties of the plaintiff—prime contractor— were performed by or through a subcontractor which was characterized as the "de-facto prime contractor". Id. at 422. Nevertheless, the nominal prime contractor was permitted to sue for damages suffered by its subcontractor. See also, *Wiseman v. Sklar, supra.*

PRWRA also contends that "it bargained for" the personal services of Mitsui USA, that such services were performed by Mitsui Ltd, that Mitsui USA was only the "front man for the Aguirre Project",[24] that all of this violated Article 22 of the Prime Contract, and, therefore, the action should be dismissed.

There is nothing in the record which supports PRWRA's claim that it "relied on" or "bargained for" the experience or expertise of Mitsui USA or for any personal performance by it. Nothing in the record indicates that this subject was even discussed during any precontract negotiations. PRWRA bases this contention on Article 22. Yet, Mr. Renan Colón, PRWRA's own chief engineer during the project, testified that he could recall no discussion of Article 22 during contract negotiations and added:

"[A]rticles of the contract they don't have to be discussed, except in cases in which they can be given some importance."

PRWRA knew from the earliest pre-award negotiations that Mitsui USA had no previous construction or contracting experience. PRWRA was told prior to the award that Mitsui USA was not in the construction business or in the business of constructing power plants; had not previously acted as a prime contractor or general contractor;

---

**24.** The significance of the "front man" argument eludes us. An agent for an undisclosed principal is clearly a front man. Yet, only the agent can sue and be sued. See, Text, *infra,* at 790. In *G. L. Christian, supra,* the plaintiff-prime contractor found the deal, allowed the subcontractor to sign the prime contract for it, took what amounted to a finder's fee and, thereafter, did nothing except bring suit for damages suffered by others who had done all the work. Despite that nominal role, the prime contractor was allowed to sue.

and, that Mitsui Ltd would work with and assist Mitsui USA on the Aguirre Project if the latter should receive the award." Before and after the award, PRWRA knowingly dealt with representatives of Mitsui Ltd concerning the work and claims. Mitsui USA never represented to PRWRA that its own employees would personally supervise or perform the services called for by the Prime Contract. Nothing in the Prime Contract requires Mitsui USA to perform its services solely through its own employees or approved subcontractors or prohibits it from using agents or consultants.

PRWRA makes much of the fact that some services on the Aguirre Project were performed by persons who had been employed by Mitsui Ltd, who were assigned to the Aguirre Project by Mitsui Ltd and who returned to the employ of Mitsui Ltd after the Aguirre Project.

However, the uncontradicted evidence shows that such persons were employees and agents of Mitsui USA while working on the Aguirre Project regardless of any arguable former, concurrent or subsequent employment or other connection with Mitsui Ltd. That is, taking PRWRA's argument at face value, the most that is shown is that such persons were employees or agents of both Mitsui entities at the same time. There is nothing in the Prime Contract which prohibits Mitsui USA from performing its services through persons who may be dual employees or agents.

PRWRA knew that the actual construction was to be subcontracted to TDK. Mitsui USA did not build anything except through subcontractors. That left supervision as the major service to be performed by Mitsui USA. That duty is specifically covered by Article 12[25] of the Prime Contract which requires Mitsui USA to give "efficient supervision to the work" and keep a "competent (s)uperintendent" on the job. This duty was discharged by Mr. Koike, President of TCI, who had no prior connection or affiliation with Mitsui Ltd or Mitsui USA.

It is well established that construction contracts are not considered personal in nature and do not require personal performance by the contractor. *Iowa Bridge Co. v. Commissioner of Internal Revenue*, 39 F.2d 777, 780 (8 Cir., 1930); *In re Stormer's Estate*, 385 Pa. 382, 123 A.2d 627, 629 (1956); *In re Burke*, 198 Cal. 163, 244 P. 340, 342 (1926); Calamari & Perillo, Contracts, p. 663 (2d Ed., 1977), 4 Corbin, On Contracts, Section 865, at 449 (1963). See, also, Santos Briz, El Contrato de Obra y su Problemática Jurídica, LBI Revista de Derecho Privado, 381, 384, 391 (1972) and authorities cited; Borrel Macia, Arrendamiento de Obras, 11 Nueva Enciclopedia Jurídica Española, 904–905 (Ed. Seix Barcelona, 1950); Puig Brutau, Fundamentos de Derecho Civil, T. 11, Vol. 2, Contratos en Particular, pp. 390–391, (Ed. Bosch, Barcelona, 1956).

We have shown above that there was no bargaining for the performance of any personal services by Mitsui USA and that the Prime Contract does not require such performance. Nevertheless, PRWRA suggests that the presence of Article 22 in the Prime Contract, which prohibits unapproved assignments or subcontracts, compels the conclusion that Mitsui USA's duties involved non-delegable personal services citing *Arnold Productions, Inc. v. Favorite Films Corp.*, 298 F.2d 540 (2 Cir., 1962); and *George v. Richards*, 361 Pa. 278, 64 A.2d 811 (1949). Neither case supports PRWRA's position.

*Arnold Productions, supra*, did not involve construction services. The subject of the contract, services as a film distribution agency, was inherently personal and the contract so stated. It involved a delegation of performance on terms substantially the same as those found in this case. The court found no breach based on a "general understanding and course of dealing" between the parties. The conduct of the parties in the instant case leads to the same result.

---

**25.** If there were a conflict between Articles 12 and 22, the specific provisions of Article 12 would control the general provisions of Article

22. See, Calamari & Perillo, Contracts, (2d Ed., 1977), at 122, n. 40; 3 Corbin, On Contracts, Section 547 (1963).

*Richards, supra,* did conclude that certain construction services were non-delegable. But, that result was reached, not because of the presence of an anti-assignment clause, but because of facts showing that non-delegability was actually part of the bargain between the parties. There are no such facts here.

Moreover, even that limited holding has been rejected by *In re Stormer's Estate,* 385 Pa. 382, 123 A.2d 627, 629–30 (1956) which applied the general rule that "building contracts generally do not involve a particular skill or ability on the part of the person who is to perform them" and are, therefore, freely delegable. The Court held that *Richards, supra,* was not to be viewed as adopting a contrary rule and, said the "fact the contract contains a provision of non-assignability has no effect on our own decision".

■ The principle that performance of services under construction contracts is fully delegable is in accord with the Civil Code of Puerto Rico which classifies this type of contract as a "lease of works". 31 L.P.R.A. 4011. "In a lease of works . . . one of the parties binds himself to execute a work . . . to the other for a specified price". 31 L.P.R.A. 4013. "In executing . . . [a construction] Contract, the owner wants a result: The means used to achieve it are of no interest to him". Borrel y Macia, Arrendamiento de Obras, *supra,* p. 905 (1950).

■ PRWRA's reliance on Article 22 is also misplaced for several other reasons. Such restrictive clauses are normally not enforced when the transaction is between entities which are related because of common ownership or control. See, *People v. McNamara,* 28 Cal.App.3d 641, 104 Cal. Rptr. 822 (3d Dist., 1972); *Thompson v. Commissioner of Internal Revenue,* 205 F.2d 73 (3 Cir., 1953); *Mellgren Plumbing Shop v. Lewis & Tinsley, Inc.,* 77 S.D. 193, 90 N.W.2d 78 (1958); *Sexton v. Nelson,* 228 Cal.App.2d 248, 258, 39 Cal.Rptr. 407 (1964). Here, the Mitsuis were related to each other. Mitsui Ltd was no stranger to PRWRA or the project. PRWRA was not deprived of the benefits which prohibitory clauses are intended to secure. On the contrary, such factors (i. e., management ability, expertise, financial responsibility) mentioned in the cases cited above were enhanced by Mitsui Ltd's role.

■ In dealing with restrictive clauses, consent or approval cannot be arbitrarily withheld by the party imposing the restriction. *E. J. Sportswear v. Sucn. Martell,* ____ P.R.R. ____, 103 D.P.R. 410, 414 (1975). On every relevant criteria, Mitsui Ltd was more qualified than Mitsui USA, which aptly described its business as "Importers and Exporters". This conclusion is reinforced by Article 1491 of the Civil Code, 31 L.P. R.A. 4131, which deals with construction "work" required to be done to the "satisfaction of the owner" and provides that, if the owner refuses to accept the work, the "approval is understood as reserved for the proper expert judgment".

PRWRA also argues that if Article 22 was breached, it is entitled to a dismissal of the complaint which would be the equivalent of a forfeiture. PRWRA cites no supporting authority.

■ In such instance, the plaintiff's breach is merely a "partial" or "immaterial" breach of an independent promise as distinguished from a total or material breach which would excuse the other party from his obligation of payment. See, generally, Restatement Contracts, Sections 268, 274; Calamari and Perillo, Contracts, 396–97, 407–12 (2 Ed., 1977); 4 Corbin, On Contracts, at 808–13 (1963); 12 Williston on Contracts, at 220–46 (3 Ed., 1970). The result is the same under the law of Puerto Rico. See, Article 1053 of the Civil Code, 31 L.P.R.A. 3017; and *Madera v. Madera,* 49 P.R.R. 159 (1935).

■ It is also settled law that restrictive clauses will not be applied so as to involve a forfeiture where the contract has been fully performed except for payment from the party relying on such clause. See, *Giustina v. United States,* 190 F.Supp. 303, 311–12 (D.Or.1960); *Prudential Federal Savings and Loan Association v. Hartford Acc. & Indem. Co.,* 7 Utah 2d 366, 325 P.2d 899, 904 (1958).

*Wiseman v. Sklar*, 104 Cal.App. 369, 285 P. 1081 (1930) involved facts which were far more extreme than anything shown by the record in this case. In *Wiseman*, there was an express request for approval of the proposed assignee which the owners rejected. Thereafter, the prime contractor secretly completed the transaction with the proposed assignee whom the owners thought was acting as the prime contractor's employee. Nevertheless, the court found no injury from the prohibited assignment since the owners received the work called for and permitted the prime contractor to sue on behalf of the assignee whom the owners had rejected. The rationale for this result was:

"It is therefore apparent that defendants have not been injured by the fact that performance was done by Wiseman under an assignment found by the court to be invalid. . . . Since (defendants) have not been injured and have what they expected to get, they cannot now be heard to complain." (285 P., at 1084)

The pleadings contain no claim of damage by PRWRA from any cause. Insofar as shown by the record, the Aguirre Project was built in accordance with the requirements of the Prime Contract and was accepted by PRWRA. If PRWRA suffered any damage, it had the burden of pleading and proving the same. It has not done so.

PRWRA also contends that Mitsui USA was controlled and dominated by Mitsui Ltd. PRWRA does not explain what consequences follow from that fact. Every parent corporation controls its wholly owned subsidiary. Such control came as no surprise to PRWRA. Mr. Colón testified that he called on Mitsui Ltd to perform certain of Mitsui USA's contract duties because he believed and expected that a parent would control its child. He said "(w)hen a father has a son, and one calls the attention of this boy, and this boy doesn't pay any attention, then one goes to the parent to tell him, so he will get spanked by that parent".

PRWRA points to no facts which would support a finding of *alter ego* or any other basis for disregarding the separate corporate entities of the two Mitsuis. In *Algonac Manufacturing Co. v. United States*, 428 F.2d 1241 (Ct.Cl., 1970) an individual plaintiff brought suit acting for himself and a corporation of which he was the only stockholder. Since the contracts at issue were between the corporation and the government, it was held that the stockholder was not a "proper party" plaintiff and that the corporation was the real party in interest. (428 F.2d, at 1249).

PRWRA also claims that Mitsui Ltd "decided to have Mitsui USA act as its agent while it remained an undisclosed principal". PRWRA cites no authority for its claim that a subsidiary corporation may be found to be the agent of its parent on the facts of this case. The test for agency under those circumstances, as set forth by Judge Learned Hand in *Kingston Drydock Co. v. Lake Champlain Transportation Co.*, 31 F.2d 265, 267 (2 Cir., 1929), is:

"Control through the ownership of shares does not fuse the corporations, even where the directors are common to each . . ., and liability normally must depend upon the parent's direct intervention in the transaction, ignoring the subsidiary's paraphernalia of incorporation, directors and officers. The test is therefore rather in the form than in the substance of the controls; in whether it is exercise immediately, or by means of a Board of Directors and Officers, left to their own initiative and responsibility in respect of each transaction as it arises."

See also, *United Paper Workers International Union v. Penntech Papers, Inc.*, 439 F.Supp. 610, at 617, n. 7, (D.Me., 1977).

Here, the "paraphernalia of incorporation, directors and officers" was not ignored but was maintained. Mr. Naruse, President of Mitsui USA, was very active during the Prime Contract negotiations and the projects. All or most of the former employees of Mitsui Ltd went on the payroll of Mitsui USA.

However, if we assume that Mitsui Ltd was an undisclosed principal and Mitsui USA was its agent, nevertheless, Mitsui USA is entitled to bring this action. Arti-

cle 1619 of the Puerto Rico Civil Code, 31 L.P.R.A., Section 4429, provides in pertinent part as follows:

> "When an agent acts in his own name, the principal shall have no action against the persons with whom the agent has contracted, nor the said persons against the principal. In such case, the agent is directly liable to the person with whom he has contracted, as if the transaction were his own."

This statute permits an agent to sue the party with whom he has contracted in his own name. See, *Scaevola*, XXVI–2 Código Civil, 41 (1951). Puerto Rico is thus in accord with the common law rule permitting suit by an agent of an undisclosed principal. See, *Albany Iron & Steel Co. v. Lundberg*, 121 U.S. 451, 7 S.Ct. 958, 30 L.Ed. 982 (1887); *Prudential Oil & Minerals Co. v. Hamlin*, 277 F.2d 384, 386 (10 Cir., 1960); *Fruit Growers Express Co. v. Plate Ice Co.*, 59 F.2d 605, 610 (4 Cir., 1932); Restatement of Agency, 2d Section 364 (1958); Mecham, Agency, Section 294, 306 (4th Ed., 1952); 2 Williston on Contracts, Section 281, at 318–19, Section 284, at 334–35 (3rd Ed., 1959).

▮ PRWRA suggests that the complaint is fatally defective because it alleges that Mitsui USA has been damaged, whereas it is really asserting "pass through" claims on behalf of TDK. PRWRA cites no relevant authority for this argument.

Under existing case law, Mitsui USA was required to plead that such claims belonged to it. In *Owens-Corning Fiberglas Corp. v. United States, supra*, 419 F.2d, at 453–54, the complaint caption stated that the subcontractors were suing "[b]y and through" plaintiff prime contractor. The court criticized this reference, quoted the contracting officer as saying that the claims had been considered by him as a claim of the prime contractor and said:

> "We also so regard it as indeed we must. A contractor's suit on a contract with the Government traditionally depends upon the plaintiff being in privity with the defendant in the contract which is the subject of the suit.... Any reference in the caption to subcontractors not in privity with the Government can be regarded solely as descriptive of the prime contractor's claim." (Citations omitted)

This follows from the rule discussed above that the damages and claims of the subcontractor against the owner are considered to belong to the prime contractor for purposes of holding the latter to be the real party in interest.

PRWRA says that it did not "suspect that plaintiff's damage claims were pass through until early 1978". The uncontradicted evidence establishes the contrary. PRWRA knew throughout the entire job that all, or almost all of the actual work had been subcontracted; that substantially all of the claims asserted by Mitsui USA represented claims for work done, or damage suffered, by subcontractors; and, that those claims formed the basis of the claims asserted in this action. PRWRA actually sent letters directly to TDK rejecting these very same claims (which Mitsui USA had earlier presented to PRWRA) for work done and damages suffered by TDK and TCI.

Also, the complaint specifically mentions PRWRA's letter of November 7, 1975, (Exhibit 2) which denied relief for these claims. (Complaint paragraph 20). That letter refers to an earlier letter from PRWRA dated July 30, 1975, addressed to TDK as an official rejection of claims presented to PRWRA by Mitsui USA. Those letters became part of the complaint by reference.

These facts establish that Mitsui USA has, in fact, pleaded that it was asserting pass-through claims assuming the law required it to do so. Be that as it may, PRWRA was aware of this fact throughout the job, it has shown no surprise and, in any event, has made no factual showing of any damage or prejudice.

For the reasons stated above, we vacate the Court's Order of August 7, 1978, and hold that a separate trial on the issue of whether Mitsui USA is the proper plaintiff to prosecute TDK's claims against PRWRA, is unnecessary. As discussed above, we are persuaded that Mitsui USA is the real party in interest under Rule 17(a) and that this

conclusion is consistent with the substantive laws of Puerto Rico to the extent that such laws are applicable.

Perhaps, at the time that the August 7, 1978, Order was entered, the state of the record was sufficient to move the Court's discretion in ordering a separate trial on the questions mentioned therein. This, however, has ceased to be the case. On the record now before us, the just, speedy and efficient disposition of this action would no longer be furthered by holding a separate trial.

We, therefore, GRANT Mitsui USA's motion, and hold, that it is entitled to prosecute the claims described above. In view of the disposition we make of the "proper plaintiff" issue, PRWRA's Cross Motion for Summary Judgment and its alternative Request for a Separate Trial, is DENIED.

IT IS SO ORDERED.